# CALDERON v. ATLAS STEAMSHIP COMPANY.

## CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE SECOND CIRCUIT.

No. 83.   Argued March 8, 9, 1898.— Decided April 25, 1898.

The appellant shipped, by a vessel belonging to the appellee, goods under a bill of lading which contained the following stipulation: "In accepting this bill of lading, the shipper, owner and consignee of the goods and the holder of the bill of lading agree to be bound by all of its stipulations, exceptions and conditions as printed on the back hereof, whether written or printed, as fully as if they were all signed by such shipper, owner, consignee or holder." Of these stipulations and conditions, this court regards only the following as material: "1. It is also mutually agreed that the carrier shall not be liable for gold, silver, bullion, specie, documents, jewellery, pictures, embroideries, works of art, silks, furs, china, porcelain, watches, clocks or for goods of any description which are above the value of $100. per package, unless bills of lading are signed therefor, with the value therein expressed, and a special agreement is made." "9. Also, in case any part of the goods cannot be found for delivery during the steamer's stay at the port of destination, they are to be forwarded by first opportunity, when found, at the company's expense, the steamer not to be held liable for any claim for delay or otherwise." "14. This agreement is made with reference to, and subject to the provisions of the U. S. carriers' act, approved February 13, 1893." The goods were not delivered at the port to which they were consigned, and were subsequently lost at sea on another vessel belonging to the appellee, on which they had been placed without the appellant's knowledge. In a suit in admiralty to recover their value, *Held*,

(1)  That as the negligence of the company was clearly proven, there can be no doubt of its liability under the act of February 13, 1893, c. 105, known as the "Harter Act;"

(2)  That the clause limiting the amount of the carriers' liability is to be construed as a statement that the carrier shall not be liable to any amount for goods exceeding $100 per package; and being so interpreted, that it is a clear attempt on the part of the carrier to exonerate itself from all responsibility for goods exceeding the value of $100 per package, and as such is not only prohibited by the Harter Act, but held to be invalid in a series of cases in this court.

THIS was a suit instituted in the District Court for the Southern District of New York, in admiralty, by the libel-

lant, Calderon, who was at that time consul general for the United States of Colombia at New York, to recover from the respondent, the Atlas Steamship Company, the sum of $5413.18, the value of a consignment of goods shipped from New York to Savanilla by the libellant on the steamer Ailsa, which goods the master failed to deliver at the port of destination, and thereafter brought back to New York, where they were reshipped by the respondent on the steamer Alvo. The goods were lost by the sinking of this ship through a peril of the sea.

It seems the respondent owned both the Ailsa and the Alvo, and ran them between New York, Kingston, Savanilla, Carthagena and Port Limon, from which last-named port they sailed direct to New York, usually carrying a cargo of fruit. Libellant had frequently shipped goods by this line and over the same route, and on July 19, 1893, about two hours before the Ailsa sailed on its regular voyage from New York, delivered to the company on its pier, under authority of a special permit from the company, the consignment of goods in question, which consisted of twenty-six bales and three crates of duck government uniforms, for transportation to the port of Savanilla, and from thence to Baranquilla in the United States of Colombia. The receipt given by the company to the truckman who delivered the goods stated that they had been received "at the shipper's risk from fire, and subject to the conditions expressed in the company's form of bill of lading."

The bill of lading, subsequently obtained in lieu of the receipt, and a copy of which was sent by mail to the consignee by the same steamer, contained on its face the provision: "And finally, in accepting this bill of lading, the shipper, owner and consignee of the goods, and the holder of the bill of lading, agree to be bound by all of its' stipulations, exceptions and conditions, as printed on the back hereof, whether written or printed, as fully as if they were signed by such shipper, owner, consignee or holder."

Of the stipulations, exceptions and conditions printed on the back, only the following are material:

"1. It is also mutually agreed that the carrier shall not be

liable for gold, silver, bullion, specie, documents, jewellery, pictures, embroideries, works of art, silks, furs, china, porcelain, watches, clocks or for goods of any description which are above the value of $100 per package, unless bills of lading are signed therefor, with the value therein expressed, and a special agreement is made."

"9. Also, in case any part of the goods cannot be found for delivery during the steamer's stay at the port of destination, they are to be forwarded by the first opportunity, when found, at the company's expense, the steamer not to be held liable for any claim for delay or otherwise."

"14. This agreement is made with reference to, and subject to the provisions of U. S. carriers' act, approved February 13, 1893."

It appeared from the testimony taken that these goods were the last to be loaded, and that instead of being stowed with other freight for Savanilla, the port of destination, they were placed in another hold of the ship and in the "last tier to come out" of the Carthagena freight. It also appeared that the consignment was not discharged at Savanilla, and that it was not discovered to be on board until the ship was well on its way to Carthagena. The ship, however, proceeded on its voyage without attempting to make the delivery of the goods, and upon receiving a cargo of fruit at Port Limon sailed for New York, where the consignment was reshipped, August 16, 1893, on the steamer Alvo. No notice was given to libellant of the return of the goods or of their reshipment. The Alvo was caught in a hurricane and lost at sea with her entire cargo.

The District Court held that there was a "failure in the proper delivery" of the goods at Savanilla, but that inasmuch as bills of lading were not signed specially designating the value of each of the twenty-nine packages, as provided by clause one on the back of the bill of lading, the liability of the company was limited to $100 for each of the twenty-nine packages, or $2900 in all. *Calderon* v. *Atlas Steamship Co.*, 64 Fed. Rep. 874.

From this decree the libellant alone appealed, and upon the

hearing the Circuit Court of Appeals for the Second Circuit, by a majority opinion, sustained the decree of the court below. 35 U. S. App. 587.

*Mr. J. Langdon Ward* for appellant.

*Mr. Everett P. Wheeler* for appellee.

MR. JUSTICE BROWN, after stating the case, delivered the opinion of the court.

Two questions are presented by the record in this case: First, whether the steamship company was liable at all under its bill of lading for the non-delivery of the goods at Savanilla; second, whether such liability was limited to the sum of $100 for each package.

1. Both the District Court and the Court of Appeals held the company to be liable under section 1 of the Harter Act, of February 13, 1893, c. 105, 27 Stat. 445, which provides "that it shall not be lawful for the manager, agent, master or owner of any vessel transporting merchandise or property from or between ports of the United States and foreign ports to insert in any bill of lading or shipping document any clause, covenant or agreement whereby it, he or they shall be relieved from liability for loss or damage arising from negligence, fault or failure in proper loading, stowage, custody, care or proper delivery of any and all lawful merchandise or property committed to its or their charge. Any and all words or clauses of such import inserted in bills of lading or shipping receipts shall be null and void and of no effect," and this, notwithstanding the provision in the bill of lading that "in case any part of the goods cannot be found for delivery during the steamer's stay at the port of destination, they are to be forwarded by first opportunity, when found, at the company's expense, the steamer not to be held liable for any claim for delay or otherwise."

As the company did not appeal from this decree it must be regarded as acquiescing in the justice of such decree to the

amount therein awarded to the libellant; but as we should not make a further decree against the company for the amount now claimed by the libellant in excess of $100 per package, if we were satisfied that the company was not liable at all, we have thought it best to consider whether the courts below were correct in their construction of the Harter Act.

It may well be questioned whether the provision "that in case any part of the goods cannot be found for delivery during the steamer's stay at the port of destination" has any application to a case where the goods were not placed in the proper compartment when stowed on board the vessel, and for which it appears no search was made upon the arrival at Savanilla, notwithstanding the fact that a bill of lading had been given for them and their shipment had been entered upon the manifest or other "cargo books" of the steamer. It appears that after leaving Savanilla the purser discovered that these goods had not been "tallied out" on the cargo-books for that port, and he at once made search for them, and found them stowed with the Carthagena cargo.

It was clearly the duty of the master of the vessel before leaving Savanilla to examine the manifests or other memoranda of the vessel to ascertain whether the portion of the cargo consigned to that place had been delivered, and if not, to search for the missing consignment before leaving the port. His failure to do this was obviously a breach of his general obligation to deliver his cargo to its consignee, and it is exceedingly doubtful whether, even in the absence of the Harter Act, the provision in the bill of lading would have excused him. But as the stipulation in the bill of lading was one which the Harter Act prohibited, it is only necessary to refer to this act to hold the company chargeable with negligence. Regard may doubtless be had to the custom of the port as to what shall be termed a proper delivery with respect to the time and manner of such delivery, but a failure to deliver at all was negligence. No such want of delivery can be excused under the terms either of the first or second section of the Harter Act. Not only was there negligence in failing to examine the ship's papers to ascertain what goods were consigned to Sava-

nilla, but there was also negligence in stowing such goods under that portion of the cargo destined for Carthagena, and thus concealing them from observation. If these goods were the last received by the vessel before her departure from New York, they would naturally have occupied a position which would have called attention to them upon arrival at the first port of destination, but they were so concealed beneath the goods consigned to another port that they were not discovered until after the vessel had left Savanilla.

The words "cannot be found" would seem to apply to a case where the goods had been misplaced, and an effort had been made to find them which had proven unsuccessful, and not to a case where no attempt whatever was made to deliver them. But however this may be, we are clearly of opinion that the provisions of section one of the Harter Act supersede and override this stipulation in the bill of lading, particularly as it is expressly provided that the agreement was "made with reference to, and subject to the provisions of the United States carriers' act, approved February 13, 1893." (Harter Act.) The first section of the act is cited above, but the second section further provides "that it shall not be lawful for any vessel transporting merchandise or property from or between ports of the United States of America and foreign ports, her owner, master, agent or manager, to insert in any bill of lading or shipping document any covenant or agreement  .  .  . whereby the obligations of the master, officers, agents or servants to carefully handle and stow her cargo, and to care for and properly deliver the same, shall in anywise be lessened, weakened or avoided."

It is to be noticed that by the first section the carrier shall not be "relieved from liability" for loss or damage arising from negligence in the proper stowage or proper delivery of the goods, while by the second section the carrier shall not insert any covenant or agreement in the bill of lading whereby the obligations of the carrier to carefully stow and properly deliver the cargo shall be "lessened, weakened or avoided." These two sections, in their general purport, so far as respects the care and delivery of the cargo, are not essentially different,

although it is possible that a somewhat ampler measure of liability was intended under the second section, which denounces any covenant whereby the obligations of the ship to properly deliver the cargo shall in anywise be lessened, weakened or avoided. As the negligence of the respondent in this connection was clearly proven, there can be no doubt of its liability under either of these sections of the Harter Act.

2. The alleged limitation of respondent's liability to the sum of $100 per package depends upon that clause of the bill of lading which declares "that the carrier shall not be liable for gold, silver, bullion, specie, documents, jewellery, pictures, embroideries, works of art, silks, furs, china, porcelain, watches, clocks or goods of any description which are above the value of $100 per package, unless bills of lading are signed therefor, with the value therein expressed, and a special agreement is made." Respondent insists that the words of this clause, "which are above the value of $100 per package," should be read as limiting its liability to $100 per package, and should be construed as if the words used were "beyond the sum or value of $100 per package." The courts below agreed in putting this interpretation upon it. Acting upon this view, it was held that the liability of the respondent was limited to $100 per package, following in this particular the rulings of this court in *Railroad Company v. Fraloff*, 100 U. S. 24, 27, and *Hart v. Pennsylvania Railroad*, 112 U. S. 331, and the principle announced in *Magnin v. Dinsmore*, 56 N. Y. 168; *S. C.* 62 N. Y. 35; 70 N. Y. 410; *Westcott v. Fargo*, 61 N. Y. 542, and *Graves v. Lake Shore & Mich. Southern Railroad*, 137 Mass. 33. In this last case the rule obtaining in this court is adopted to its full extent by the Supreme Judicial Court of Massachusetts. In these cases it was held to be competent for carriers of passengers or goods, by specific regulations brought distinctly to the notice of the passenger or shipper, to agree upon the valuation of the property carried, with a rate of freight based on the condition that the carrier assumes liability only to the extent of the agreed valuation, even in case of loss or damage by the negligence of the carrier, and that such contracts will be upheld as a lawful method of securing

a due proportion between the amount for which the carrier may be responsible and the freight he receives, and of protecting himself against extravagant and fanciful valuations. See also *Ballou* v. *Earle*, 17 R. I. 441; *Richmond & Danville Railroad* v. *Payne*, 86 Virginia, 481; *J. J. Douglas Company* v. *Minnesota Transportation Co.*, 62 Minnesota, 288.

We are, however, not content with the construction put upon the contract by the courts below. Whether the limitation of liability to goods above the value of $100 per package applies to "gold, silver, bullion, specie, documents, jewellery, pictures, embroideries, works of art, silks, furs, china, porcelain, watches, clocks," as well as to goods of other descriptions, may admit of some doubt, in view of the fact that by Rev. Stat. § 4281 the vessel and her owners would not be liable for such articles at all, unless specifically mentioned at a valuation agreed upon. This stipulation in the bill of lading having been inserted by the ship owner for its own benefit, could scarcely have been intended to enlarge its statutory liability, and the more reasonable interpretation would seem to be that the company was not intended to be held liable at all for these articles. But whether this be so or not, the stipulation may be read as if those words were omitted, namely, that the carrier shall not be liable for goods of any description "which are above the value of $100 per package." The plain and unequivocal meaning of these words is that the carrier shall not be liable to any amount for goods exceeding in value $100 per package. It is true that contracts for the carriage of goods by water, as well as by land, frequently contain a provision limiting the liability of the carrier to a certain amount, usually $100 per package, and it was apparently in view of this custom that the courts below gave a like interpretation to the words of this stipulation. But this certainly does violence to its language. If it had been intended to so limit the respondent's liability, it would have been easy to say so, and the very fact that different language was used from that ordinarily employed indicates a desire on the part of the carrier to limit his liability to goods which are of less value than $100 per package. It is possible that the draughtsman of this bill of

lading may have had the more common limitation in his mind, and may have intended that the carrier should incur a liability upon all goods to the extent of $100 per package, but he certainly was unfortunate in the language he chose for that purpose. If, as we have already intimated, the carrier intended to exempt itself from all liability for the articles specifically mentioned in this clause, it is scarcely to be supposed that it intended to make itself liable to the amount of $100 for goods of other descriptions, which were above that value per package. It was probably intended that the carrier should incur no liability whatever for the value of the articles specifically mentioned, as well as for all other goods exceeding the value of $100 per package, while it remained liable to the full amount for goods of other descriptions which were of less value.

It is true that in cases of ambiguity in contracts, as well as in statutes, courts will lean toward the presumed intention of the parties or the legislature, and will so construe such contract or statute as to effectuate such intention ; but where the language is clear and explicit there is no call for construction, and this principle does not apply. Parties are presumed to know the force and effect of the language in which they have chosen to embody their contracts, and to refuse to give effect to such language might result in artfully misleading others who had relied upon the words being used in their ordinary sense. In construing contracts words are to receive their plain and literal meaning, even though the intention of the party drawing the contract may have been different from that expressed. A party to a contract is responsible for ambiguity in his own expressions, and has no right to induce another to contract with him on the supposition that his words mean one thing while he hopes the court will adopt a construction by which they would mean another thing more to his advantage. Clark on Contracts, p. 593.

It was said of penal statutes by Mr. Chief Justice Marshall in *United States* v. *Wiltberger*, 5 Wheat. 76, 95, that " the intention of the legislature is to be collected from the words they employ. Where there is no ambiguity in the words,

there is no room for construction. The case must be a strong one indeed which would justify a court in departing from the plain meaning of words, especially in a penal act, in search of an intention which the words themselves did not suggest. To determine that a case is within the intention of a statute, its language must authorize us to say so."

Similar language was used by Mr. Justice Swayne in *United States* v. *Hartwell,* 6 Wall. 385, 396 : " If the language be clear it is conclusive. There can be no construction where there is nothing to construe. The words must not be narrowed to the exclusion of what the legislature intended to embrace; but that intention must be gathered from the words, and they must be such as to leave no room for a reasonable doubt upon the subject. It must not be defeated by a forced and overstrict construction. The rule does not exclude the application of common sense to the terms made use of in the act in order to avoid an absurdity, which the legislature ought not to be presumed to have intended. When the words are general and include various classes of persons, there is no authority which would justify a court in restricting them to one class and excluding others, where the purpose of the statute is alike applicable to all." See also Endlich on the Interpretation of Statutes, § 4.

In this case the contract is one prepared by the respondent itself for the general purposes of its business. With every opportunity for a choice of language, it used a form of expression which clearly indicated a desire to exempt itself altogether from liability for goods exceeding $100 in value per package, and it has no right to complain if the courts hold it to have intended what it so plainly expressed. If the language had been ambiguous we might have given it the construction contended for, which probably conforms more nearly to the clause ordinarily inserted in such cases, but such language is too clear to admit of a doubt of the real meaning. The clause in question seems to have been taken from the English carriers' act, 11 Geo. IV, and 1 Wm. IV, c. 68, which received a construction similar to that we have given to it in *Morritt* v. *Northeastern Railway Co.,* 1 Q. B. D. 302.

Under this interpretation there is a clear attempt on the part of the carrier to exonerate itself from all responsibility for goods exceeding the value of $100 per package. Such exemption is not only prohibited by the Harter Act, but is held to be invalid in a series of cases in this court, culminating in *Chicago, Milwaukee &c. Railway* v. *Solan,* 169 U. S. 133, 135, wherein it was said that "any contract by which a common carrier of goods or passengers undertakes to exempt himself from all responsibility for loss or damage arising from the negligence of himself or servants, is void as against public policy, as attempting to put off the essential duties resting upon every public carrier by virtue of his employment, and as tending to defeat the fundamental principle upon which the law of common carriers was established." The difficulty is not removed by the fact that the carrier may render itself liable for these goods, if "bills of lading are signed therefor, with the value therein expressed and a special agreement is made." This would enable the carrier to do, as was done in this case — give a bill of lading in which no value was expressed, under which it would not be liable at all for the safe transportation and proper delivery of the property. This would be in direct contravention of the Harter Act. Indeed, we understand it to be practically conceded that under the construction we have given to this clause of the contract the exemption would be unreasonable and invalid.

*The decree of the District Court is therefore reversed, and the case remanded to that court with directions to assess the value of the libellant's goods, and to enter a decree in conformity with the opinion of this court.*

Mr. Justice White concurred in the result.

Mr. Justice Brewer dissented.