CITY OF ST. LOUIS v. CHICAGO HOUSE WRECKING CO.†

(Circuit Court of Appeals, Eighth Circuit. October 29, 1912.)

No. 3,713.

1. MUNICIPAL CORPORATIONS (§ 120*)—CITY ORDINANCES—CONSTRUCTION.

A city ordinance, authorizing the Louisiana Purchase Exposition Company to use one of the city parks for its exposition, provided that the city's board of public improvements should have power to regulate the construction of all sewers, drains, and conduits of any kind, and the laying of water pipes or fixtures, that no such work should be done without the approval of the board, and that "all such sewers, drains, conduits, pipes, and fixtures should become and be the property of the city." The succeeding section required the Exposition Company, within 6 months after the close of the exposition, to clear the site, and within 12 months restore the park according to plans to be approved by the board. Held, that the ordinance was not to be construed as vesting in

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

† Rehearing denied November 25, 1912.

the city, after the exposition, title only to such sewer and water pipes, tubes, drains, conduits, and appertaining fixtures as were necessary to the park as restored, but that all of the sewer and water pipes, drains, etc., and fixtures, except those above ground in the buildings, belonged to the city.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§ 274–280; Dec. Dig. § 120.*]

2. MUNICIPAL CORPORATIONS (§ 120*)—ORDINANCES—"CONSTRUCTION"—WHAT CONSTITUTES.

Construction of a city ordinance is an effort, by applying certain rules, to ascertain the intention of the parties, when it is not clearly disclosed by their own forms of expression. If the language is clear and explicit, no exposition contrary to the express words will be allowed; but when construction is needed, the relation between the parties, the circumstances attending the execution of the instrument, and the acts done under it before a difference arose may be considered, to determine the identity of the subject-matter and its extent, and to explain ambiguities and uncertainties in the terms, not, however, to substitute another contract or other terms for those clearly and definitely expressed.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§ 274–280; Dec. Dig. § 120.*

For other definitions, see Words and Phrases, vol. 2, pp. 1479–1480.]

Appeal from the Circuit Court of the United States for the Eastern District of Missouri; David P. Dyer, Judge.

Suit by the Chicago House Wrecking Company against the City of St. Louis. Judgment for complainant, and defendant appeals. Reversed and remanded.

Truman P. Young, of St. Louis, Mo. (Lambert E. Walther, of St. Louis, Mo., on the brief), for appellant.

W. D. McHugh, of Omaha, Neb., and Arthur B. Shepley, of St. Louis, Mo. (Eugene S. Wilson, of St. Louis, Mo., on the brief), for appellee.

Before SANBORN and HOOK, Circuit Judges.

HOOK, Circuit Judge. This is an appeal by the city of St. Louis, Mo., from a decree which enjoined it from interfering with the Chicago House Wrecking Company in removing certain sewers, drains, conduits, pipes, and fixtures from the grounds occupied by the Louisiana Purchase Exposition of 1904. The controversy turns upon the meaning of an ordinance adopted by the city and accepted by the Exposition Company in 1901, giving the latter the right to occupy upon conditions specified one of three designated park locations in the city. The Wrecking Company, the appellee here, succeeded to the rights of the Exposition Company in the materials in controversy, by purchasing what is commonly termed the wreckage to be removed after the close of the exposition. The first section of the ordinance granted to the Exposition Company the right to occupy either O'Fallon Park, Carondelet Park, or, roughly speaking, the west half of Forest Park. The one last named was selected. The exposition, which was subsequently held there, its national and international importance, the extent and magnificence of the structures, grounds, and exhibits,

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

are matters of public history and need not be recited here.  Section 2 of the ordinance, which is the one making particular provision regarding the materials in controversy is as follows:

"The board of public improvements shall at all times, beginning with the selection of the site out of the three sites above referred to, until the close of said world's fair or exposition and until the complete restoration of said site as hereinafter provided, have the power to provide such regulations, conditions and requirements as it may deem necessary to protect the interests of the city, with respect to the construction of all sewers, drains and conduits of any kind, and the laying of water pipes or fixtures; and the plans and specifications for the construction of the foregoing work shall be subject to the approval of the board of public improvements, and no such work of any kind shall be done without such approval by the board.  All such sewers, drains, conduits, pipes and fixtures shall become and be the property of the city."

Section 3 required the Exposition Company, within 6 months after the close of the exposition, to clear the site chosen of "all tramways and all railway tracks, rubbish and débris, and of all buildings, sheds, pavilions, towers and other structures of every kind," and within 12 months to restore the park "by doing all necessary grading, the restoration and repair or the formation of all walks and roads, the planting of trees," etc., according to plans to be approved by the board of public improvements.

[1] The controversy arose when the Wrecking Company, in the demolition of the buildings and removal of the materials, commenced excavating and taking up the pipes.  On its part the city appropriated funds for the specific purpose of taking up the water pipes.  The former contended, and the trial court held, in the suit for an injunction, that the right of the city evidenced by the ordinance was confined to the sewer and water pipes, tubes, drains, conduits, and appertaining fixtures which, *as laid, were necessary to the use of the park as restored.*  The contention of the city was as broad as the language of section 2; that is to say, that it was entitled to all such pipes, etc., as had been put upon the premises, whether necessary to the park as restored or not.  Which was right is the question for decision here.

[2] In a controversy over the meaning of a written contract, the duty of the court is to ascertain and give effect to the intention of the contracting parties.  Primarily that intention is to be gathered from the instrument itself, reading the language they have adopted according to its ordinary and popular sense.  Construction is an effort by applying certain rules to ascertain the intention of the parties, when it is not clearly disclosed by their own forms of expression.  In contracts, as in statutes, "where the language is clear and explicit, there is no call for construction."  Calderon v. Steamship Co., 170 U. S. 272, 280, 18 Sup. Ct. 588, 591 (42 L. Ed. 1033).

' The contract being free from ambiguity, no exposition is allowed contrary to the express words of the instrument."  United States v. Gleason, 175 U. S. 588, 606, 20 Sup. Ct. 228, 235 (44 L. Ed. 284).

But, when construction is needed, the relations between the parties to a contract, the circumstances attending its execution, and the acts done under it before a difference has arisen, are admissible to disclose

the identity of the subject-matter and its extent, and to explain ambiguities and uncertainties in its terms, not, however, for the purpose of substituting another contract or other terms for those clearly and definitely expressed. If the character and extent of the subject-matter is fully disclosed, and the terms employed fit unambiguously and definitely, the contract is not to be displaced or modified, though a court may be of opinion that it is unduly favorable to one of the parties, or that, if the attention of the other had been directed to certain phases of its operation, he might have insisted differently.

"Previous and contemporary transactions and facts may be very properly taken into consideration to ascertain the subject-matter of a contract and the sense in which the parties may have used particular terms, but not to alter or modify the plain language which they have used." Brawley v. United States, 96 U. S. 168, 24 L. Ed. 622.

With these well-established principles in mind, let us examine the contract which was made by the adoption of the ordinance and its acceptance.

We think it is quite clear that the subject-matter of the contract, or rather that separable and distinct part of it which is involved in this controversy, embraces all the sewers, drains, and water pipes laid in the grounds occupied by the exposition, including the appertaining fixtures. The second section of the ordinance, which deals particularly with this matter, says:

"All sewers, drains, and conduits of any kind," and water pipes and fixtures; that "the plans and specifications for the construction of the foregoing work shall be subject to the approval of the board of public improvements, and no such work of any kind shall be done without the approval of the board."

In the sense in which it is used, the phrase "of any kind" means of every kind. The final sweeping clause of the section is in these words:

"All such sewers, drains, conduits, pipes and fixtures shall be and become the property of the city."

It would not ordinarily occur to a person reading this section that the subject of the contract was less comprehensive than as shown by the obvious and natural import of the words used; that is, all the sewers, drain pipes, and water pipes of every kind laid in the ground, and their appurtenant fixtures. But counsel for the Wrecking Company invoke a consideration of section 3 as being part of the contract upon this particular matter, and they contend that, when read in connection with section 2, it discloses that the interest of the city sought to be expressed and preserved was solely and exclusively in the restoration of the park after the exposition was over, and that the phrase, "all sewers, drains, water pipes and fixtures of any kind," means only such as were necessary to that principal end. With the common knowledge of other great expositions before them when the ordinance was drawn and accepted, it must have been apparent to the parties that a part of the pipes necessary to a great project of that character would not, as laid by the Exposition Company, be necessary to the grounds when restored to their former condition. In-

deed, this must have been so manifest at the time that it is improbable that the contracting parties would have failed to express appropriate words of limitation, had they entertained such an intention. A restriction or exception of such an important character would not ordinarily have been left to a construction which is at once difficult and contrary to the natural import of the words they actually employed.

But counsel say it cannot be believed that the city was exacting compensation for the use of its park. We look at it in another way. Of the $26,000,000 expended on the exposition, the city aided directly to the extent of $5,000,000, and undoubtedly helped generously in other and indirect ways. The site, the use of which it gave for about three years, including the period of preparation, was a public place of recreation, in which its citizens were generally interested. The drains and pipes would be of comparatively small value as wreckage, and at a time several years before the exposition closed the full ownership and control of them might well have been regarded as of advantage to the city, either that it might have a free hand in their selection and arrangement in the restored grounds, or for further improvement in the future. The grant of them by the Exposition Company was for a public use, not a private one, and it was a part of a large transaction, in which the city yielded much and contributed liberally. Considering the relations of the parties and the circumstances, a counter contribution was hardly an exaction. During the period of the work of preparation for the exposition the board of public improvements of the city affirmatively asserted the right given by section 2 of the ordinance to pass upon the plans and specifications for the laying of the drains, pipes, etc., and its right was at no time denied. Nor at any time was a distinction made between such of the drains, pipes, etc., as were necessary for the park as restored and those not so necessary. So far as the record shows, a distinction of that kind was not raised or suggested before the Wrecking Company purchased of the Exposition Company and began the work of removal, though there were occasions in which it would naturally have been asserted, had there been ground for it in the contract. It may be said generally that the acts of the parties under the contract were more consistent with the present position of the city than with that of the Wrecking Company.

A special contention is made by the Wrecking Company regarding the pipes of a high-pressure water system designed for protection against fire, but what we have said about the meaning and scope of the contract applies as well to them. It is urged that they should be excluded from the operation of the contract, because they were not in contemplation when it was made, and also because they were of different material from the others, being of wrought iron or steel, instead of cast iron, and differently joined together. The ordinance was adopted in May, 1901, while the pipes were not laid until 1902. It cannot reasonably be said that any particular kind of pipes was in contemplation, or not in contemplation, when the contract was made. It must necessarily have been known only in a general way that a system of

sewers and drains and of pipes for a water supply and for fire protection would have to be laid. All of these would be necessary to the exposition; but the details, the kind of pipes, where laid in the grounds, the dimensions, how they should be joined, etc., were necessarily for the future, and it is improbable that such details were in mind or in definite contemplation when the contract was made. Acting in advance, and upon a most general view of the future needs, the parties contracted comprehensively that the city should have all such pipes of every kind, and giving to the provision its natural, ordinary meaning it must be held to embrace those carrying water for the extinguishment of fires. This conclusion is not affected by the fact that afterwards and during the progress of the work the Exposition Company thought the low-pressure water system would suffice, but was required by a fire prevention bureau to install one in which the water was maintained at high pressure. It is worthy of note that, when the high-pressure system was about to be installed, the city asserted its right under section 2 of the ordinance to pass upon the plans. It made objections to the kind of pipe and to the character of the fixtures, which it afterwards waived; but the fact remains that its right of supervision was not questioned or denied. The interest of the city, which it was seeking to protect, was in the restoration of the grounds and also its reversionary title to the pipes.

We think, however, that the title of the city is confined to the sewers, drains, and high and low pressure water pipes which were laid in the exposition grounds, and their immediate fixtures, such as hydrants, plugs, valves, and the like, and that it does not extend to the installations above ground in the buildings. The latter are more properly fixtures of the buildings, or business facilities. This line of proprietary separation is a common one in sewer and water systems, and that it was intended by the contracting parties is reasonably deducible from their language. There was also an implied recognition of it in the course of some exhibitors, who installed their own pipes, etc., of that character in the structures occupied by them. The phrase "sewers, drains and conduits," in a contract for the occupancy of land, does not ordinarily include those additional constructions in the buildings which are to be removed at the end of the term. The limitation of the pipes to those in the ground, with their directly attached fixtures, is also indicated by the phrase "the laying of water pipes," found in section 2 of the ordinance. The laying of water pipes in a designated tract of land would not commonly be taken to include the supplemental installations in the buildings. About one-third of the high-pressure water pipes were above ground and along the walls, in the galleries, and on the roofs of the exposition buildings, in some instances forming, with their attachments, what are called "sprinkler systems." They should be regarded as belonging or pertaining to the buildings, rather than as an integral part of the underground works, which supplied the water. For similar reasons the pipes of the Cascade and their immediate fixtures are not included among those granted to the city.

Under the protection of the injunction of the trial court the Wreck-

ing Company removed and converted to its own use all the pipes, etc., which, as laid, were not necessary to the park as restored. The city is entitled to the value, less the reasonable cost of removal, of such of them as belonged to it according to the foregoing conclusions. The reasonable cost of removal should be deducted, because, had the city prevailed, it would also have done the work. The record does not enable us to ascertain the quantities with sufficient definiteness for a just decree. It can be done by the trial court upon further evidence, if the parties do not agree.

The decree is reversed, and the cause is remanded for further proceedings in conformity with this opinion.