**W. R. GRACE & CO. v. TOYO KISEN KABUSHIKI KAISHA.**

(District Court, N. D. California, S. D. September 15, 1925.)

No. 17363.

**1. Shipping ⚖125—General liberty clause to be given effect, when not conflicting with law or real intent of contract.**

General liberty clause in bill of lading is to be given effect, in so far as not in conflict with Harter Act (Comp. St. §§ 8029–8035), or general purpose and policy of law, or real intent of contract of shipment; but reserved general liberty of departure from route of contractual voyage will justify only such deviations from such route as are consistent with main commercial purpose of the affreightment contract, propriety of any particular deviation being a question of fact in each case, depending on surrounding circumstances.

**2. Shipping ⚖125—In view of liberty clause, held no deviation herein of which shipper might complain.**

In view of liberty clause in bill of lading of nitrate shipped from Chile to Honolulu by ship "bound for Honolulu," though the "usual and customary" route of carrier's ships had been up to San Francisco, and from there direct to Honolulu, yet during the last year or two before the shipment some of them having first gone to Portland, to complete cargo, and carrier having, before the nitrate was loaded and bill of lading was issued, notified shipper that the ship in question would do so, and shipper, who was also carrier's agent, having as such agent loaded the nitrate, so that the ship could proceed to Portland and take on lumber, held, there was no deviation of which shipper could complain.

In Admiralty. Libel by W. R. Grace & Co. against Toyo Kisen Kabushiki Kaisha. Decree for respondent.

Harold M. Sawyer and Alfred T. Cluff, both of San Francisco, Cal., for libelant.

Thomas B. Dozier, Dozier & Dozier, and Dozier, Kimball & Dozier, all of San Francisco, Cal., for respondent.

PARTRIDGE, District Judge. Libelant shipped 2,500 tons of sodium nitrate from Iquique and Antofagasta to Honolulu, on the Japanese steamer Tokuyo Maru. The ship proceeded north to San Francisco, via various ports, and thence to Portland, where she completed cargo by loading lumber. Immediately after leaving Portland, she was destroyed by fire, and all cargo lost. The nitrate, which is alleged to be of the value of $250,000, was insured by various underwriters, in the sum of about $190,000. This insurance was paid to libelant, so that the libel is prosecuted on behalf of the underwriters to the amount of the insurance paid, and the balance for the benefit of libelant.

The basis of the libel is a deviation. The direct route from the nitrate ports to Honolulu, of course, is far away from the actual voyage of the vessel; but it is not claimed that she should have taken the direct route. On the contrary, libelant bases its claim upon the proposition that the "usual and customary" route from nitrate ports to Honolulu was northerly to San Francisco, and thence directly to the port of discharge. Hence it is urged that the extension of the voyage northerly to Portland was a deviation.

Libelant is a dealer in the markets of the world on a large scale. It is also engaged in the shipping business, and has branches, agencies, and subsidiaries in many lands. Admittedly, it has a "steamship depart-

ment" in Valparaiso, and subsidiaries known as "Nitrate Agencies, Limited," at Antofagasta and Iquique. This steamship department and this subsidiary corporation constitute respondent's agency in Chile; that is, it is admitted, in legal effect, that libelant, at the times here involved, was the agent of the respondent, in charge of its shipping business at the South American ports. Libelant also has a branch in San Francisco, where is located, also, respondent's principal office for the Americas. On the 19th of January, 1921, libelant's San Francisco office wrote a letter to respondent's San Francisco office, confirming telephonic conversation for a "freight engagement" for 2,500 long tons of nitrate, "March shipment from nitrate port to Honolulu," at a specified freight. This was accepted and confirmed by respondent. On the same day, libelant wrote to its branch in Valparaiso that it had "arranged shipment of this parcel through the local office of the T. K. K. on the Tokuyo Maru, scheduled to sail from nitrate port about the middle of March."

Accordingly the Valparaiso office of libelant instructed its subsidiary to load the nitrate. It was delivered to the Tokuyo, part at Antofagasta on March 15th, and part at Iquique on March 19th. On receipt of the goods, the master of the ship issued its bills of lading, both of which specified that the nitrate was shipped by Nitrate Agencies, Limited, agents of libelant, on board the Tokuyo Maru, "now laying (sic) in the port of Antofagasta (Iquique) and bound for Honolulu." There was no other designation of the route.

The libelant, however, contends that the usual language of bills of lading, or contracts of affreightment of any kind, is merely from loading port to discharging port, and that this language always implies a shipment by the usual and customary route. It is not insisted, therefore, that the ship should have gone directly from the nitrate ports to Honolulu; on the contrary, libelant shows that the respondent had for many years maintained a regular fleet of steamers between the Orient and South America, the return voyage being up the coast to San Francisco, and thence by Honolulu to their home ports. Thus the various ships of respondent made, in 1918, six such voyages; in 1919, six; in 1920, four. In the latter year, however, two of respondent's vessels returned to the Orient via Portland, but did not touch at Honolulu. In 1921, before the shipment involved here, two of respondent's ships made the return voyage, one via Portland not touching at Honolulu, and one returning by way of both Portland and Honolulu.

Libelant's position, therefore, is that the "usual and customary voyage" implied in the contract of affreightment was by way of San Francisco, and that the voyage of the ill-fated Tokuyo Maru was a deviation in that she continued northerly by way of Portland. Respondent answers that, if there was such custom and usage, it had ceased to be such because, prior to the shipments here, the last four of its vessels had returned via Portland. It insists, moreover, that it was clearly understood that the ship here involved was to visit Portland for cargo. This contention is based upon the following admitted facts:

(1) Respondent's South American line is subsidized by the Japanese government. The statute of the empire, entitled "Ocean Going Liners' Subsidy Act," provides that a subsidized company must get a permit from the Minister of Communication before it can add a port of call. On February 8, 1921, the respondent obtained such a permit, allowing the Tokuyo Maru to call at Portland. The libelant had full knowledge of the fact of the subsidy, and the provisions of the law of the empire with reference to changing ports of call.

(2) This change of route, to include Portland, was extensively advertised, both in the public prints devoted to shipping and commerce and by private communications to interested shippers, including libelant.

(3) On February 23, 1921, respondent cabled to libelant's Valparaiso office, advising that the schedule of the Tokuyo's homeward voyage was revised on account of her Portland call, and instructing libelant, as respondent's agent, to notify the master and Iquique. Upon receipt of this cablegram, libelant at Valparaiso transmitted it to the Nitrate Agencies, Limited, at Iquique. On March 11th respondent cabled libelant to stow the nitrate in such a way as to provide for loading wet lumber at Portland, and directing libelant to notify the master accordingly.

Respondent contends that all this shows that the contract of affreightment was entered into with full knowledge that the custom or usage no longer prevailed, and the presumption rebutted. Libelant, on the other hand, insists that this evidence is all inadmissible as an attempt to vary the terms of a written contract. The argument is that there is an implied agreement in every con-

tract of affreightment to carry the goods by the usual and customary route; that parol evidence is necessarily admissible to show what that usual and customary route is, but such evidence is not admissible to show an agreement to change the usual and customary route, or an agreement as to the route of the particular voyage.

Respondent, moreover, relies upon this language of the bills of lading: "All vessels to have liberty to touch at any port or ports in rotation or order in or out of the customary route." The bills of lading also contain a provision, by which it is agreed that respondent should not be liable for loss or damage by fire to any goods capable of being covered by insurance. Then there was stamped upon the bills of lading these words: "Insured under Messrs. W. R. Grace & Co.'s open policy of insurance." This "open policy" was issued to libelant on all Pacific Coast vessels "for account of whom it may concern," and purported to cover all shipments in which libelant might have an interest. The policy provides: "The exceptions and permissions in bill of lading and for other contract between shippers and shipowners are admitted by the underwriters on this policy." And further: "With leave to call and stay at all ports or places in any rotation, in or out of the customary route, for all purposes, whether necessary or not, and particularly for orders; agreed to hold the assured covered in case of deviation and/or change of voyage."

The foundation for most of the cases upon general liberty clauses in bills of lading seems to be the opinion of Lord Herschell in Glynn v. Margetson, [1893] A. C. 351. The principle laid down is as follows: "The ports, a visit to which would be justified under this contract, will no doubt differ according to the particular voyage stipulated for between the shipper and the shipowner; but it must in my view be a liberty consistent with the main object of the contract, a liberty only to proceed to and stay at ports which are in the course of the voyage. In that, of course, I am speaking in a business sense. It may be said that no port is directly in the course of the voyage (indeed, that was argued by the learned counsel for the appellants), inasmuch as in merely entering a port or approaching it nearly you deviate from the direct course between the port of shipment and the ultimate port of destination. That is perfectly true; but in a business sense it would be perfectly well understood to say that there were certain ports in the way between Malaga and Liverpool, and those are the ports at which I think the right to touch and stay is given." The doctrines of Glynn v. Margetson were followed in England in White v. Granada S. S. Co., 13 T. L. R. 1, The Dunbeth, 8 Asp. M. C. 307, Sergeant v. East Asiatic S. S. Co., 21 Com. Cas. 334, and Smith v. The King, 14 Asp. M. C. 53.

In this country, Judge Brown adopted Lord Herschell's views in Calderon v. Atlas Steamship Co., 64 F. 874 (affirmed by the Circuit Court of Appeals 69 F. 574, 16 C. C. A. 332, and the Supreme Court 170 U. S. 272, 18 S. Ct. 588, 42 L. Ed. 1033. Judge Brown says: " * * * But the Harter Act prohibits the insertion of any stipulation excusing a 'failure in proper delivery.' The words 'proper delivery,' as used in the act, cannot mean any kind of a delivery that may be stipulated for, however unreasonable the stipulation may be, since that would thwart the very purpose of the first section of the statute, which was designed to protect shippers against the imposition of unreasonable stipulations in bills of lading to the prejudice of their interests. It is, perhaps, competent for the parties to make special provisions as to the mode of delivery, having reference to the usual ways of business, and the conveniences or necessities of vessels in touching at various ports; and in so far as these stipulations are shown by the circumstances to be reasonable, they may be upheld, as defining what a 'proper delivery' shall be, and may thus justify what might not otherwise be held to be a proper delivery. Further than this, such stipulations cannot go without subverting the purpose of the act." Those principles run on through Swift & Co. v. Furness, Withy & Co. (D. C.) 87 F. 345; Austrian S. S. Co. v. Calafiore, 194 F. 377, 114 C. C. A. 295; The Blandon (D. C.) 287 F. 722; The Maine (D. C.) 1924 A. M. C. 820; The Willdomino (C. C. A.) 300 F. 5; The West Aleta (D. C.) 1924 A. M. C. 1318, 2 F.(2d) 390.

[1] As a conclusion from all the cases, it is apparent that the "general liberty" clause is not treated as of "no effect." It is a stipulation of the parties, to be given effect, like other stipulations, in so far as it does not conflict with the Harter Act (Comp. St. §§ 8029–8035), or the general purpose and policy of the law, or the real intent of the contract between shipper and carrier. It may be fairly said that reservations by a carrier of general liberties of departure from the route of the contractual voyage must be read in due relation and subordination to

the main commercial purpose of the contract of affreightment, and as a matter of law will justify only such deviations from that route as are consistent with that particular commercial purpose.

The propriety of any particular deviation is a question of fact in each case and there is no fixed rule for such determination. It is a question of inherent reasonableness, and pertinent to the inquiry of the surrounding circumstances, namely, the commercial adventure, which is the subject of the contract, the character of the vessel, the usual and customary route, the natural and usual ports of call, the location of the port to which the deviation was made, and the purpose of the call thereat.

[2] Applying these principles, we find, in the first place, that the underwriters, who are the principal parties in interest here, had consented to any possible deviation, and had evidently paid the loss up to the amount of their policies upon that theory. Admittedly, also, the route which these ships of respondent's South American line had long taken was far away from the direct route; that is, the particular kind of cargo here involved had always been carried up the coast as far as San Francisco before setting out for Honolulu. A situation arose, before these goods were shipped, where vessels on this line could no longer obtain full cargo without going to Portland. Several of their vessels actually went there before the bills of lading were issued. But, more than that, the respondent announced in every way that it could that there would be a change in its route to include the northern port. The contention of libelant amounts to this: That a steamship company cannot change its "usual and customary" route, so as to include additional ports of call, except by specific agreement incorporated in the contract of affreightment. This theory is based upon the American case of The Delaware, 14 Wall. 579, 20 L. Ed. 779, and the English case of Leduc v. Ward, 20 Q. B. D. 475, 6 Asp. M. C. 290.

The American case held that, inasmuch as the contract of affreightment carried an implied agreement to stow below, evidence of a parol understanding to stow on deck was not admissible. But in that case no evidence was necessary to show the character or extent of the implication. It followed inevitably from the written agreement. But, admittedly, the implication that goods are to be carried by the "usual and customary" route requires evidence to explain what that route is. Of course, no one would contend that the carrier could not controvert that evidence, and show that some other was the "usual and customary" route. Why, then, could it not show that it had changed the custom, and no longer intended to follow that route, and had given plenary notice of its intention so to do? And, having done this, would it not rebut the presumption of the route theretofore followed?

In the English case, parol evidence of a verbal understanding that the particular vessel was to deviate from the usual route was rejected. But in that case the usual route was in effect the direct route, touching at various ports. It required little evidence, if any, which was not part of general geographical information, and hence within the judicial knowledge of the court. Nor, in that case, was there any question of an announced determination to change or abandon the custom. I think the distinction is clear. Besides, the matter is to be determined in the light of the liberty clause of the contract. It was certainly reasonable for the respondent to send the vessel to the only port where she could complete cargo, if she gave full notice to libelant of her intention to do so, and if libelant, with full knowledge of that intention, shipped its goods upon that vessel. The libelant was to the fullest extent agent for respondent in matters pertaining to shipping from South American ports. As such agent, it participated in the loading of this very cargo in such a manner that the ship could proceed to Portland and take on lumber. It seems to me that it would be inequitable for libelant, as shipper, to refuse to be bound by a change of route which, as agent for the carrier, it had caused to be put into effect.

I think the decree should be with the respondent; and it is so ordered.