## In re ALLIED PROPERTIES CO.

## In re BUCKEYE SHERIFF STREET REALTY CO.

## CLEVELAND TRUST CO. v. REALTY CORPORATION et al.

### No. 8723.

Circuit Court of Appeals, Sixth Circuit.
April 7, 1941.

774

W. H. Bemis, of Cleveland, Ohio (Donald D. Wick, W. H. Bemis, and Baker, Hostetler & Patterson, all of Cleveland, Ohio, on the brief), for appellant.

T. M. Dye and Kenneth Resseger, both of Cleveland, Ohio (John D. Fackler, Trafton M. Dye, and Fackler & Dye, all of Cleveland, Ohio, on the brief), for appellee Realty Corporation.

E. G. Halter, Kenneth Resseger, and Calfee & Fogg, all of Cleveland, Ohio, for appellee Florence A. McDonald.

Before SIMONS, ALLEN, and MARTIN, Circuit Judges.

MARTIN, Circuit Judge.

In corporate reorganization proceedings, under Chapter X of the National Bankruptcy Act, 11 U.S.C.A. § 501 et seq., the Cleveland Trust Company, as successor trustee under a trust indenture for the debtor, The Allied Properties Company (hereinafter called "Allied"), and as the holder in trust of $424,000 of first mort-

gage leasehold bonds of The Buckeye Sheriff Street Realty Company, subsidiary debtor (hereinafter called "Buckeye"), has appealed from an order of the District Court overruling its objections to the interim report of the special master, approved, confirmed and adopted by the District Judge. The challenged order sustained the claim of priority for $11,000 face amount of the subsidiary debtor's bonds, which were not exchanged for bonds of the debtor company, and decreed that these $11,000 of unexchanged bonds are entitled to separate classification for the purpose of any plan of reorganization or liquidation of the subsidiary debtor company.

Realty Corporation is the owner of $5,000 face amount, and Florence A. McDonald of $1,000 face amount of such unexchanged Buckeye bonds. The owners of the remaining $5,000 face amount of the unexchanged bonds held entitled to preferential classification personally have filed no claims, and are unknown. In his interim report, the master states that "the parties agree that the presently unlocated bonds are entitled to the same classification as that to be given the bonds of Realty Corporation and McDonald subject to suitable provisions in the event such unlocated bonds are not presented within a certain time."

The District Court decreed, further, that the Cleveland Trust Company, as successor trustee for the Buckeye bonds, has a valid secured claim for the benefit of Buckeye bondholders under the Buckeye first mortgage deed of trust in the amount of $435,000, with interest less liquidating payments.

Inasmuch as analysis of the transactions involved impels the conclusion that our decision of the issue presented must respond to the plain meaning of Section 4 of Article III of the trust indenture, executed April 1, 1924, to secure the Buckeye bonds, we shall not complicate a simple question with unnecessary ramifications.

Briefly, then, The Cuyahoga Land and Securities Company, an Ohio holding company, owned substantially all of the capital stock of Buckeye, Superior Third Realty and Fourth Commercial Realty Companies, all three of which held ninety-nine-year leases on improved Cleveland real estate and had outstanding issues of leasehold bonds.

On March 21, 1927, Cuyahoga addressed a letter to all known bondholders of its

subsidiary companies, painting a gloomy picture concerning their tenant losses, operating deficits, and unfavorable income positions, and asserting that "with the object in mind of preventing any default either now or in the future," the directors desired to submit a proposal "as a means to protect and save the interests of all parties concerned." The letter stated that "either this company or a new company to be formed will take title to all of the properties affected, or control them through stock ownership."

It was proposed that the bondholders of the respective companies exchange their presently held bonds at par for collateral trust bonds at par, and "that the present bonds be deposited with the trustee as the collateral for the new bonds." It was asserted that "by this operation, the underlying security remains the same, all of the present bonds so exchanged being pledged as collateral, but the company is relieved of the burden of the high interest rate and the principal payments now due."

Pursuant to the plan outlined in the letter, a new corporation, The Allied Properties Company (the debtor in this cause), with officers and directors interlocking with the old companies, was incorporated under the laws of Ohio on May 23, 1927, and acquired all of the common stock of Buckeye (the subsidiary debtor), and stock control of the other two subsidiary companies. Practically all of the bonds of the three subsidiary companies were exchanged for the bonds of Allied, as planned, and were pledged with the trustee under the Allied trust indenture.

All the Buckeye bonds have matured for payment in accordance with the covering trust indenture recorded April 14, 1924, but no part of the principal of the $435,000 face amount of bonds issued has been paid and no interest thereon has been paid since October 1, 1929. There have been two liquidating payments aggregating seven per cent, however, on account of the principal of the Buckeye bonds.

Although Allied defaulted in the payment of interest on its outstanding bonds on April 1, 1930, no action to foreclose the Buckeye bond mortgage has been taken.

The special master found, and the District Judge approved his findings, that "(1) an extension, within the meaning of Section 4 of Article III of the first mortgage deed of trust dated April 1, 1924, between The Buckeye Sheriff Street Realty Company and the * * * Trustee, of the payment of the principal and interest upon bonds issued thereunder, was effected in 1927; (2) that the subsidiary debtor [Buckeye] approved such extension; and (3) that the $11,000.00 principal amount of bonds including the bonds owned by Realty Corporation and McDonald, not exchanged pursuant to the 1927 plan, did not assent to or participate in the extension aforesaid."

The District Judge found, further, that the main purpose of the 1927 plan, as executed, was to extend the maturity of the exchanged Buckeye Bonds by indirection and to reduce the interest rate thereon.

Section 4 of Article III of the trust indenture securing the Buckeye bonds is explicit in its provisions against extension of time for payment of principal or interest, and in its requirement of prior payment of unextended bonds and coupons should the time of payment of any of the bonds be nevertheless extended. The clear-cut covenant of Buckeye with the trustee reads: "Section 4. In order to prevent any accumulation of coupons after maturity, the Company will not, directly or indirectly, extend or assent to the extension of the time for payment of any bond or coupon appertaining to any bond; and the Company will not, directly or indirectly, be a party to or approve any such extension by purchasing or funding said bonds or coupons, or in any other manner. In case the time for the payment of any such bonds or coupons shall be so extended, whether or not such extension be by or with the consent of the Company, such bonds or coupons shall not be entitled, in any case of default hereunder, to the benefit of the security of this Mortgage, except subject to the prior payment in full of the principal of all the bonds then outstanding, and of all coupons appertaining to such bonds, the payment of which shall not have been so extended, with interest."

■ This language is plain and unambiguous, and leaves no room for construction. See Calderon v. Atlas Steamship Company, 170 U.S. 272, 280, 18 S.Ct. 588, 42 L.Ed. 1033. A direct inhibition is placed upon an indirect, as well as a direct, extension by Buckeye of the time for payment of any bond or coupon secured by the Buckeye trust indenture.

■ The record contains substantial evidence other than that already summarized to support the finding and conclusion of the District Court that the time for pay-

776

ment of the Buckeye bonds was, in fact, extended by the plan consummated through the medium of the interlocking transactions among the Cuyahoga and Allied holding companies and the Buckeye, Superior Third Realty and Fourth Commercial Realty subsidiary companies.

Kennedy, vice-president and trust officer of the Midland Bank, which was the first trustee under the Allied indenture, testified that, because the companies were in no position "to meet a series of maturities of these various bond issues," a plan had been worked out with an underwriting house whereby "the outstanding bonds of the various corporations would be picked up and the bonds of the Allied Properties Company substituted for them"; and that the Allied bonds would have a maturity over a fifteen-year period, with the result that the time when it would be necessary to meet the payment of the bonds then outstanding would be extended.

Wurstner, secretary and treasurer, and a director, of the Buckeye, Cuyahoga and Allied companies, admitted on the witness stand that the purpose of the 1927 scheme was to save the subsidiary companies from the dangers of default and foreclosure on the bond issues, and to prevent wiping out the equity of the stockholders, among whom he and Hennessy, president, were the heaviest, each owning 25 per cent of Cuyahoga capital stock. He said that he had pointed out to bondholders that "the companies were not going to be able to meet the interest or principal maturities when they fell due, and there was a real likelihood that the bonds would be in default; that we felt that if we could exchange the bonds that they held for bonds at the lower interest rate and with different maturity arrangements, that we could leave with them bonds which would not be in default, and the companies would probably be enabled to carry through the period of distress, which we thought was temporary."

The accomplishment of the purpose thus described was easy by reason of the fact that Buckeye was admittedly the wholly-owned subsidiary of Allied and, as averred in the debtor's petition in this cause, practically all bonds and capital stock of Buckeye were pledged with appellant as trustee, "so that for all practical purposes the title of the aforesaid leasehold estate is vested in the debtor [Allied] and is thus security for the Debtor's outstanding bond issue."

The Cuyahoga, Allied and Buckeye companies each had the same president, and the same secretary and treasurer. The companies were closely interlocked. Under all the circumstances, the transactions among them do not carry the earmarks of arm's length bargains. Pepper v. Litton, 308 U. S. 295, 306, 60 S.Ct. 238, 84 L.Ed. 281. The officers and directors of Buckeye, in a directors' meeting of March 31, 1927, approved the plan embracing the exchange of the bonds "as for the best interest of the company and the officers were authorized to proceed with such plans."

After the exchange had been effectuated in accordance with the plan, the actual status of the former Buckeye bondholder was that instead of holding a seven per cent bond maturing in a serial order between 1927 and 1939, he possessed a six per cent bond, maturing in 1942. It is manifest that, as a result of the exchange-of-securities scheme, the time for payment of his bond has been indirectly extended. This was the actual effect of the corporate manipulations affecting the interlocking companies. After the plan had been consummated, the trustee under the Allied mortgage took no steps for twelve years to foreclose the Buckeye mortgage, although no payment has been made on the principal of the bonds.

The argument of appellant that, on the separate corporate entity theory, the exchange of Allied bonds for Buckeye bonds could not be considered a refunding or a purchase by Buckeye of its own securities, carries no weight, for the reason that the Buckeye corporation was controlled by Allied. See Pacific Can Co. v. Hewes, 9 Cir., 95 F.2d 42, 46; Commerce Trust Co. v. Woodbury, 8 Cir., 77 F.2d 478, 487. The companies did not deal at arm's length. See Pepper v. Litton, supra.

Nor is it material that an extension of the time for payment of a note beyond the due date can be accomplished only by an agreement, either express or implied. Luster v. First National Bank, 111 Okl. 168, 239 P. 128; Elk Horn Bank & Trust Co. v. Spraggins, 182 Ark. 27, 34 S.W.2d 858, 859; Lanum v. Harrington, 267 Ill. 57, 107 N.E. 826; Brunson v. Dawson State Bank, Tex.Civ.App., 175 S.W. 438, 443.

The set of circumstances which we find in this record constituted in our judgment an indirect extension, in plain contravention of Section 4 of Article III of the

Buckeye trust indenture. This being true, it follows from the obvious language of the section that all Buckeye bonds, the payment of which has not been extended by consent of the owners, are entitled to "prior payment in full" of the principal of the bonds and the appertaining coupons.

It has been held, with respect to a trust indenture securing bonds, that a similar provision concerning subordination and separate classification in the event of extension was valid and enforceable in bankruptcy proceedings. St. Louis Union Trust Co. v. Champion Shoe Machinery Co., 8 Cir., 1940, 109 F.2d 313.

■ Appellant presents the additional contention against the allowance of the claim of appellee Realty Corporation—not levelled against appellee Florence A. McDonald—that the $5,000 face amount of Buckeye bonds with which we are concerned were acquired by Realty Corporation, when already the holder of $36,500 face amount of Allied bonds, and that the Buckeye bonds purchased by the Realty Corporation should therefore be held in trust for all Allied bondholders. The argument rests upon the ancient doctrine that tenants in common stand in such confidential relationship that it would be inequitable to permit one to buy an outstanding adversary claim for his exclusive benefit, and that such purchasing co-tenant must be considered as holding the purchased claim in trust for the benefit of all co-tenants in proportion to their respective interests in the common property, provided they contribute their share of his necessary expenditures. Coburn v. Page, 105 Me. 458, 74 A. 1026, 1027, 134 Am.St.Rep. 575; Booker v. Crocker, 8 Cir., 132 F. 7.

It is charged that appellee Realty Corporation, in its effort to establish the priority of its subsequently-acquired $5,000 face amount of Buckeye bonds, occupies the inconsistent position that it had previously participated in the exchange of Buckeye bonds for Allied bonds under the plan which it now denounces as a violation of Section 4 of Article III of the Buckeye mortgage.

We find no fiduciary relationship in the situation confronting us. Realty Corporation was not a trustee or fiduciary, but was merely an investor in bonds. Even though having previously owned Buckeye bonds which it had exchanged for Allied bonds, it was a free agent to purchase in its own behalf, with all rights and privileges thereunto appertaining, any outstanding, unexchanged Buckeye bonds which it chose to acquire on the open market. Furthermore, the record reveals no offer, past or present, by appellant to reimburse Realty Corporation for money expended in the purchase of the controverted bonds.

Accordingly, the order of the District Court, entered May 31, 1940, is affirmed.