## ST. LOUIS & S. F. R. CO. v. BILBY.

No. 2430.   Opinion Filed March 11, 1913.

(130 Pac. 1089.)

1.   CARRIERS—Commerce—Transportation of Live Stock—Interstate Shipments—Limited Liability—State Regulations.  On account of the passage of the Act of Congress of June 29, 1906, c. 3591, 34 St. at L. 584 (U. S. Comp. St. Supp. 1911, p. 1284), the state, under its police power, has ceased to have the authority to pass acts relative to contracts made by carriers pertaining to interstate shipments, and section 9 of article 23 (section 358, Williams' Ann. Const. Okla.) of the Constitution of this state applies only to intrastate shipments (following **Adams Express Co. v. Croninger,** 226 U. S. 491, 33 Sup. Ct. 148, 57 L. Ed. ——; decided by the Supreme Court of the United States on January 6, 1913).

(a)   As to interstate shipments, the common-law liability of the carrier for the safe carriage of property may be limited by a special contract with the shipper, where such contract, being supported by a consideration, is reasonable and fairly entered into by the shipper, and does not attempt to cover losses caused by the negligence or misconduct of the carrier (following **Adams Express Co. v. Croninger,** supra).

(b)   As to intrastate shipments, only such contracts as are made between the carrier and the shipper pursuant to rules and regulations adopted by the Corporation Commission of this state are valid.

(c)   All contracts or bills of lading made or issued by carriers as to intrastate shipments, which are inconsistent with the rates, charges, classifications, rules, and regulations adopted by the Corporation Commission of this state, are void.

2.   APPEAL AND ERROR—Carriers—Evidence—Trial—Transportation of Live Stock—Damages—Issues—Instructions.  The petition claimed, as one of the grounds for damages, "rough and indifferent handling," by which the "cattle were badly bruised." Over the objection of the defendant (plaintiff in error), the plaintiff (defendant in error) was permitted to prove that the cattle were badly bruised, which was caused by being lugged about in the cars and jammed against the sides of the cars and ends of the same.  Held, not to be reversible error under the issues as framed.

(a)   To lay a foundation for the admission of evidence as to the value or damage to cattle, it is sufficient to show that the witness' knowledge was that of a cattle raiser or dealer, and by pricing the same at the time the cattle alleged to have been damaged were placed on the market; the witness stating that he knew the market price.  The weight of the opinion or statement as to such price then given is for the jury.

(b) The Live Stock Reporter, which was sought to be introduced in evidence in order to show the market quotations of cattle, neither having been made a part of the record nor the part thereof specially sought to be introduced, this court, on review, is unable to determine whether any error prejudicial to the right of the plaintiff in error was committed, and, under such circumstances, the alleged error cannot be considered on review here.

(c) Although the instruction which was asked on the part of the plaintiff in error, but refused by the trial court, may correctly define the law applicable to the issue or issues in the case, yet, if the subject upon which the instruction was requested is fully covered in the general charge, no reversible error will operate on account of the refusal of the trial court to give same.

(Syllabus by the Court.)

*Error from Hughes County Court;*
*P. W. Gardner, Judge.*

Action by N. V. Bilby against the St. Louis & San Francisco Railroad Company. Judgment for plaintiff, and defendant brings error. Affirmed.

*W. F. Evans, R. A. Kleinschmidt,* and *E. H. Foster,* for plaintiff in error.

*Lewis C. Lawson,* for defendant in error.

WILLIAMS, J. This proceeding in error was commenced to review the judgment of the trial court, wherein the defendant in error, as plaintiff, had sued the plaintiff in error, as defendant, to recover damages on a certain shipment of cattle delivered to the railroad company at Holdenville, Okla., on April 6, 1909, to be delivered by said carrier at the National Stock Yards, Ill.

For convenience, in this opinion the plaintiff will be referred to as shipper, and the defendant as carrier.

The carrier answered by general denial, and further as follows:

"Defendant admits that on April 6, 1909, it received a shipment of cattle from the plaintiff for transportation from Holdenville, Okla., to National Stock Yards, Ill., but avers that at said time this defendant had two rates for the transportation of live stock, to wit, a rate at carrier's risk and a reduced rate under a contract limiting the liability of the carrier, and that plaintiff had the option of shipping said stock at either of said rates;

that plaintiff elected to ship said cattle at the reduced rate, and requested, in writing, the transportation of said cattle at such reduced rate under the terms of a contract limiting the liability of the carrier; that said contract, among other things, provided: 'That shipper acknowledges that he has had the option of shipping the live stock at carrier's risk at a higher rate, or under this contract at a lower rate, and that he has elected to make this contract and accept the lower rate. The evidence that the shipper, after a full understanding hereof, agrees to this contract and all the limitations and provisions herein contained is his signature hereto.'

"The defendant agreed to transport said cattle under the terms of said contract limiting the liability of the carrier; said written contract providing for the transportation of said cattle was duly executed by plaintiff and defendant, and a copy of the same is hereto attached and for certainty marked Exhibit A and made a part of this answer.

"Defendant avers that it is provided in said contract as follows: '(a) Live stock is not to be transported or delivered within any specified time, nor in season for any particular market. The company shall not be liable for delay caused by storms, rains, failure of engines, cars, or machinery, obstructions to the track, or from any cause whatever.'

"Defendant further avers that it is provided in said contract as follows: '(b) The company shall not be responsible for any death, loss, or injuries sustained by the live stock from any defect in the cars, overloading of cars, escaping of live stock, or because the live stock are wild, unruly, or weak, or maiming each other or themselves, or from fright, crowding, heat, or suffocation. (c) No agent of this company has authority to waive, modify, or amend any limitation or provision of this contract, or to furnish any special kind of cars, or to furnish cars at any fixed time, or to agree to transport the live stock by any certain train, or within any fixed time, or to reach any particular market, which the company hereby expressly declines to do.'

"And this defendant avers that said cattle were transported to National Stock Yards, Ill., in the ordinary and usual course of transportation, and defendant further avers that, under the terms of said contract, it is only required to transport said cattle by its regular freight trains, and by its first trains moving toward the point of destination, which defendant avers it did.

"Defendant avers that it was provided in said contract executed for the consideration above mentioned as follows: '(d) As a condition precedent to recovery of damages for any death,

loss, injury, or delay of the live stock, the shipper shall give notice in writing of his claim to some general officer of the company or the nearest station agent or 'the agent at destination, and before the live stock is mingled with other live stock, and within one day after its delivery at destination, so that the claim may be promptly and fully investigated, and a failure to comply with this condition shall be a bar to the recovery of any damages for such death, loss, injury, or delay.'

"And defendant avers that said plaintiff wholly failed to give any notice of any claim for injury to such stock to any of the persons mentioned in said contract within one day after the delivery of said stock at its destination, and before said stock was mingled with other live stock, and defendant believes such failure on the part of the plaintiff is a bar to any recovery in this action."

Afterwards an amendment was filed by the shipper to his original petition, by which he claimed the additional sum of $214.60 by reason of the depreciation in the price of the cattle on account of the delay in shipment.

The shipper demurred to the portion ·of the answer hereinbefore set out, which is referred to as paragraph 2. The order of the court thereon is as follows:

"The court sustains the demurrer of the plaintiff to so much of the second paragraph of the defendant's answer as seeks to make the company not liable for failure of engines, class of machinery, obstructions to the track, or for any cause whatever; the court sustains the demurrer of· plaintiff to so much of the second paragraph of defendant's answer as seeks to make it a condition precedent to the recovery of damages for any death, loss, or injury or delay of live stock, that notice in writing of such claim should be given within one day after its delivery at destination; the limitation being regarded by the court as not reasonable, to which the defendant excepts."

· In due time the shipper filed a reply denying:

" *   *   *  That, at the time of the shipment mentioned in plaintiff's petition, the plaintiff was offered his option by defendant of shipping said cattle at a rate at carrier's risk, or a reduced rate under a contract limiting the liability of the carrier. Plaintiff admits signing a bill of lading, but says that he did not have time or opportunity to read same, and that he was not acquainted with the contents of same, and that he was not told by the agent of the defendant that there were provisions in said bill

of lading, seeking to limit defendant's liability. Plaintiff further says that, when he signed said bill of lading, he did not know, nor was he advised, that there was a provision requiring him to give notice of damage or injury within one day, and that said provision is unreasonable; but plaintiff avers that he did give notice to defendant of the said injury at the earliest possible moment; that said notice was given, as plaintiff believes, within one day from the arrival of said stock at its destination."

This was an interstate shipment, and the question arises as to the validity of the provision requiring notice within one day after the delivery of said cattle as a condition precedent to recovery.

Section 9, art. 23 (section 358, Williams' Ann. Const. Okla.), of the Constitution of this state, is as follows:

"Any provision of any contract or agreement, express or implied, stipulating for notice or demand other than such as may be provided by law, as a condition precedent to establish any claim, demand, or liability, shall be null and void."

Unless the state, by action of Congress, has ceased to have jurisdiction of such matters as to interstate shipments, this provision applies and renders the provision of the bill of lading for such notice void. *Western Union Telegraph Co. v. Crawford,* 29 Okla. 143, 116 Pac. 925, 35 L. R. A. (N. S.) 930; *Gray v. Reliable Ins. Co.,* 26 Okla. 592, 110 Pac. 728.

In *Adams Express Co. v. Croninger,* 226 U. S. 491, 33 Sup. Ct. 148, 57 L. Ed. ——, decided by the Supreme Court of the United States on January 6, 1913, in an opinion by Mr. Justice Lurton, it is said:

"The answer relies upon the Act of Congress of June 29, 1906 [34 St. at L. 584, c. 3591 (U. S. Comp. St. Supp. 1911, p. 1284)], being an act to amend the Interstate Commerce Act of 1887 [Act Feb. 4, 1887, c. 104, 24 St. at L. 379 (U. S. Comp. St. 1901, p. 3154)], as the only regulation applicable to an interstate shipment, and avers that the limitation of value, declared in its bill of lading, was valid and obligatory under that act. This defense was denied. This constitutes the federal question and gives this court jurisdiction. * * *

"The question upon which the case must turn is whether the operation and effect of the contract for an interstate shipment, as shown by the receipt or bill of lading, is governed by the local

law of the state, or by the acts of Congress regulating interstate commerce.

"That the constitutional power of Congress to regulate commerce among the states and with foreign nations comprehends power to regulate contracts between the shipper and the carrier of an interstate shipment, by defining the liability of the carrier for loss, delay, injury, or damage to such property, needs neither argument nor citation of authority.

"But it is equally well settled, that, until Congress has legislated upon the subject, the liability of such a carrier, exercising its calling within a particular state, although engaged in the business of interstate commerce, for loss or damage to such property, may be regulated by the law of the state. Such regulations would fall within that large class of regulations which it is competent for a state to make in the absence of legislation by Congress, growing out of the territorial jurisdiction of the state over such carriers, and its duty and power to safeguard the general public against acts of misfeasance and nonfeasance committed within its limits, although interstate commerce may be indirectly affected. *Smith v. Alabama,* 124 U. S. 465 [8 Sup. Ct. 564, 41 L. Ed. 508] ; *New York, etc., R. v. New York,* 165 U. S. 628 [17 Sup. Ct. 418, 41 L. Ed. 853] ; *Chicago, Milwaukee Ry. Co. v. Solan,* 169 U. S. 133, 137 [18 Sup. Ct. 289, 42 L. Ed. 688] ; *Richmond, etc., Ry. v. Patterson Co.,* 169 U. S. 311 [18 Sup. Ct. 335, 42 L. Ed. 759] ; *Cleveland, etc., Ry. v. Illinois,* 177 U. S. 514 [20 Sup. Ct. 722, 44 L. Ed. 868] ; *Pennsylvania Railroad v. Hughes,* 191 U. S. 477 [24 Sup. Ct. 132, 48 L. Ed. 268]. In the Solan case, cited above, it was said of such state legislation:

" 'They are not, in themselves, regulations of interstate commerce, although they control, in some degree, the conduct and the liability of those engaged in such commerce. So long as Congress has not legislated upon the particular subject, they are rather to be regarded as legislation in aid of such commerce, and as a rightful exercise of the police power of the state to regulate the relative rights and duties of all persons and corporations within its limits.'

"In that case the court upheld the validity of an Iowa statute which made void every 'contract, receipt, rule or regulation, which shall exempt any railway from liability as a common carrier, which would exist had no contract, receipt, rule or regulation been made or entered into.'

"The contract there involved was for transportation of cattle with a drover in charge, and the shipper had signed a contract limiting the liability to himself or the drover to $500 for injury

to the person of the drover. Proof was offered that this limitation was the consideration for a reduced rate of transportation.

"In *Pennsylvania Railroad v. Hughes,* 191 U. S. 477, 487, 491 [24 Sup. Ct. 132, 48 L. Ed. 268], there was involved a bill of lading in all essentials identical with the one here concerned, whereby it was stipulated that, in consideration of a reduced rate of freight, the shipper should receive, in case of negligent loss, the agreed value declared in the receipt. The shipment was made in New York, where the stipulation was valid, to a point in Pennsylvania, where such a limitation was invalid. The loss occurred in the latter state; and the Supreme Court of the state upheld a judgment for the full value, declaring the limitation invalid as forbidden by the public policy of that state. That case came to this court upon the contention that the Pennsylvania court, in refusing to limit the recovery to the valuation agreed upon, had denied to the railroad company a right or privilege secured to it by the Interstate Commerce Law. But this court as to that said:

" 'It may be assumed that under the broad power conferred upon Congress over interstate commerce, as defined in repeated decisions of this court, it would be lawful for that body to make provision as to contracts for interstate carriage, permitting the carrier to limit its liability to a particular sum in consideration of lower freight rates for transportation. But, upon examination of the terms of the law relied upon, we fail to find any such provision therein. The sections of the interstate commerce law relied upon by the learned counsel for plaintiff in error [Act Feb. 4, 1887, c. 104] 24 St. at L. 379, 382 [U. S. Comp. St. 1901, p. 3154], [Act March 2, 1889, c. 382] 25 U. S. St. at L. 855 [U. S. Comp. St. Supp. 1911, p. 1289], provide for equal facilities to shippers for the interchange of traffic; for nondiscrimination in freight rates; for keeping schedules of rates open to public inspection; for posting the same in public places, with certain particulars as to charges, rules, and regulations; for the publication of joint tariff rates for continuous transportation over one or more lines, to be made public when directed by the Interstate Commerce Commission; against advances in joint tariff rates, except after ten days' notice to the commission; against reduction of joint tariff rates, except after three days' like notice; making it unlawful for any party to a joint tariff to receive or demand a greater or less compensation for the transportation of property between points, as to which a joint tariff is made different than is specified in the schedule filed with the commission; giving remedies for the enforcement of the foregoing provisions, and providing penalties for their violation; making it unlawful to

prevent continuous carriage, and providing that no break of bulk, stoppage or interruption by the carrier, unless made in good faith for some necessary purpose without intention to evade the act, shall present the carriage of freights from being treated as one continuous carriage from the place of shipment to the place of destination.

" 'While under these provisions it may be said that Congress has made it obligatory to provide proper facilities for interstate carriage of freight, and has prevented carriers from obstructing continuous shipments on interstate lines, we look in vain for any regulation of the matter here in controversy. There is no sanc-- tion of agreements of this character limiting liability to stipulated valuations; and, until Congress shall legislate upon it, is there any valid objection to the state enforcing its own regulations upon the subject, although it may to this extent indirectly affect interstate commerce contracts of carriage?'

"In view of the decisions of this court in the two cases last referred to, we shall assume that this case is governed by them, unless the subsequent legislation of Congress is such as to indicate a purpose to bring contracts for interstate shipments under one uniform rule of law not subject to the varying policies and legislation of particular states.

"The original Interstate Commerce Act of February 4, 1887, was extensively amended by the Act of June 29, 1906, 34 St. at L. 584. We may pass by many of the changes and amendments made by the latter act as not decisive, and come at once to the far more important amendment made in the twentieth section, an amendment bearing directly upon the carrier's liability or obligation under interstate contracts of shipment, and generally referred to as the Carmack Amendment. * * *

"This amendment came under consideration in *Atlantic Coast Line v. Riverside Mills*, 219 U. S. 186 [31 Sup. Ct. 164, 55 L. Ed. 167, 31 L. R. A. (N. S.) 7]; but the opinion and judgment was confined to that provision of the act which made the initial carrier liable for a loss upon the line of a connecting carrier, the property having been received under a bill of lading which confined the liability of the initial carrier to loss occurring upon its own line.

"The significant and dominating features of that amendment are these:

"First. It affirmatively requires the initial carrier to issue 'a receipt or bill of lading therefor,' when it receives 'property for transportation from a point in one state to a point in another.'

"Second. Such initial carrier is made 'liable to the lawful

holder thereof for any loss, damage, or injury to such property caused by it.'

"Third. It is also made liable for any loss, damage, or injury to such property caused by 'any common carrier, railroad, or transportation company to which such property may be delivered, or over whose line or lines such property may pass.'

"Fourth. It affirmatively declares that 'no contract, receipt, rule, or regulation shall exempt such common carrier, railroad, or transportation company from the liability hereby imposed.'

"Prior to that amendment, the rule of carrier's liability for an interstate shipment of property, as enforced in both federal and state courts, was either that of the general common law as declared by this court and enforced in the federal courts throughout the United States (*Hart v. Railroad,* 112 U. S. 331 [5 Sup. Ct. 151, 28 L. Ed. 717]), or that determined by the supposed public policy of a particular state (*Pennsylvania Railroad v. Hughes,* 191 U. S. 477 [24 Sup. Ct. 132, 48 L. Ed. 268]), or that prescribed by statute law of a particular state (*Chicago, etc., Railroad v. Solan,* 169 U. S. 133 [18 Sup. Ct. 289, 42 L. Ed. 688]).

"Neither uniformity of obligation nor of liability was possible until Congress should deal with the subject. The situation was well depicted by the Supreme Court of Georgia in *Southern Pacific Railway Co. v. Crenshaw* [5 Ga. App. 675] 63 S. E. 865, where that court said:

" 'Some states allowed carriers to exempt themselves from all or a part of the common-law liability by rule, regulation or contract; others did not. The federal courts sitting in the various states were following the local rule; a carrier being held liable in one court when, under the same state of facts, he would be exempt from liability in another. Hence this branch of interstate commerce was being subjected to such a diversity of legislative and judicial holding that it was practically impossible for a shipper, engaged in a business that extended beyond the confines of his own state, or a carrier whose lines were extensive, to know without considerable investigation and trouble, and even then oftentimes with but little certainty, what would be the carrier's actual responsibility as to goods delivered to it for transportation from one state to another. The congressional action has made an end to this diversity, for the national law is paramount and supersedes all state laws as to the rights and liabilities and exemptions created by such transaction. This was doubtless the purpose of the law; and this purpose will be effectuated and not impaired or destroyed by the state courts obeying and enforcing the provisions of the federal statute, where applicable to the facts in such cases as shall come before them.'

"That the legislation supersedes all the regulations and policies of a particular state upon the same subject results from its general character. It embraces the subject of the liability of the carrier under a bill of lading which he must issue, and limits his power to exempt himself by rule, regulation, or contract. Almost every detail of the subject is covered so completely that there can be no rational doubt but that Congress intended to take possession of the subject and supersede all state regulation with reference to it. Only the silence of Congress authorized the exercise of the police power of the state upon the subject of such contracts. But, when Congress acted in such a way to manifest a purpose to exercise its conceded authority, the regulating power of the state ceased to exist. *Northern Pacific Ry. v. State of Washington,* 222 U. S. 370 [32 Sup. Ct. 160, 56 L. Ed. 237]; *Southern Ry. Co. v. Reid,* 222 U. S. 424 [32 Sup. Ct. 140, 56 L. Ed. 257]; *Mondou v. Railroad,* 223 U. S. 1 [32 Sup. Ct. 169, 56 L. Ed. 327, 38 L. R. A. (N. S.) 44]; *Michigan Central Railroad v. Vreeland* [227 U. S. 59, 33 Sup. Ct. 192, 57 L. Ed. ——], just decided.

"To hold that the liability therein declared may be increased or diminished by local regulation or local views of public policy will either make the provision less than supreme or indicate that Congress has not shown a purpose to take possession of the subject. The first would be unthinkable, and the latter would be to revert to the uncertainties and diversities of rulings which led to the amendment. The duty to issue a bill of lading, and the liability thereby assumed are covered in full; and, though there is no reference to the effect upon state regulation, it is evident that Congress intended to adopt a uniform rule, and relieve such contracts from the diverse regulation to which they had been theretofore subject.

"What is the liability upon the carrier? It is a liability to any holder of the bill of lading which the primary carrier is required to issue 'for any loss, damage, or injury to such property caused by it,' or by any connecting carrier to whom the goods are delivered. The suggestion that an absolute liability exists for every loss, damage, or injury, from any and every cause, would be to make such carrier an absolute insurer and liable for unavoidable loss or damage, though due to uncontrollable forces. That this was the intent of Congress is not conceivable. To give such emphasis to the words 'any loss or damage' would be to ignore the qualifying words 'caused by it.' The liability thus imposed is limited to 'any loss, injury, or damage caused by it or a succeeding carrier to whom the property may be delivered,'

and plainly implies a liability for some default in its common-law duty as a common carrier.

"But it has been argued that the nonexclusive character of this regulation is manifested by the proviso of the section, and that state legislation upon the same subject is not superseded, and that the holder of any such bill of lading may resort to any right of action against such a carrier conferred by existing state law. This view is untenable. It would result in the nullification of the regulation of a national subject, and operate to maintain the confusion of the diverse regulations which it was the purpose of Congress to put an end to.

"What this court said of the twenty-second section of this Act of 1906 in the case of *Texas & Pac. Ry. v. Abilene Cotton Mills*, 204 U. S. 426, [27 Sup. Ct. 350, 51 L. Ed. 553, 9 Ann. Cas. 1075], is applicable to this contention. It was claimed that that section continued in force all rights and remedies under the common law or other statutes. But this court said of that contention, what must be said of the proviso in the twentieth section, that it was 'evidently only intended to continue in existence such other rights or remedies for the redress of some specific wrong or injury, whether given by the Interstate Commerce Act, or by state statute, or common law, not inconsistent with the rules and regulations prescribed by the provisions of this act.' Again it was said of the same clause, in the same case, that it could 'not in reason be construed as continuing in a shipper a common-law right, the existence of which would be inconsistent with the provisions of the act. In other words, the act cannot be said to destroy itself.'

"To construe this proviso as preserving to the holder of any such bill of lading any right or remedy which he may have had under existing federal law at the time of his action gives to it a more rational interpretation than one which would preserve rights and remedies under existing state laws, for the latter view would cause the proviso to destroy the act itself. One illustration would be a right to a remedy against a succeeding carrier, in preference to proceeding against the primary carrier, for a loss or damage incurred upon the line of the former. The liability of such succeeding carrier in the route would be that imposed by this statute, and for which the first carrier might have been made liable.

"We come now to the question of the validity of the provision in the receipt or bill of lading limiting liability to the agreed value of $50, as shown therein. This limiting clause is in these words:

" 'In consideration of the rate charged for carrying said property, which is regulated by the value thereof and is based upon a valuation of not exceeding $50, unless a greater value is declared, the shipper agrees that the value of said property is not more than $50, unless a greater value is stated herein, and that the company shall not be liable in any event for more than the value so stated, nor for more than $50, if no value is stated herein'

"The answer states that the schedules which the express company had filed with the Interstate Commerce Commission showed rates based upon valuations, and that the lawful and established rate for such a shipment as that made by the plaintiff from Cincinnati to Augusta, having a value not in excess of $50, was 25 cents, while for the same package, if its value had been declared to be $125, the amount for which the plaintiff sues as the actual value, the lawful charge, according to the rate filed and published, would have been 55 cents. It is further averred that the package was sealed, and its contents and actual value unknown to the defendant's agent.

"That no inquiry was made as to the actual value is not vital to the fairness of the agreement in this case. The receipt which was accepted showed that the charge made was based upon a valuation of $50, unless a greater value should be stated therein. The knowledge of the shipper that the rate was based upon the value is to be presumed from the terms of the bill of lading and of the published schedules filed with the commission. That presumption is strengthened by the fact that, across the top of this bill of lading, there was this statement in bold type: 'This company's charge is based upon the value of the property, which must be declared by the shipper.'

"That a common carrier cannot exempt himself from liability for his own negligence or that of his servants is elementary. *York Co. v. Central Railroad,* 3 Wall. 107 [18 L. Ed. 170]; *Railroad Co. v. Lockwood,* 17 Wall. 357 [21 L. Ed. 627]; *Bank of Kentucky v. Adams Express Co.,* 93 U. S. 174 [23 L. Ed. 872]; *Hart v. Pennsylvania Railroad,* 112 U. S. 331, 338 [5 Sup. Ct. 151, 28 L. Ed. 717]. The rule of the common law did not limit his liability to loss and damage due to his own negligence, or that of his servants. That rule went beyond this, and he was liable for any loss or damage which resulted from human agency, or any cause not the act of God or the public enemy. But the rigor of this liability might be modified through any fair, reasonable, and just agreement with the shipper which did not include exemption against the negligence of the carrier or his servants. The

inherent right to receive a compensation commensurate with the risk involved the right to protect himself from fraud and imposition by reasonable rules and regulations, and the right to agree upon a rate proportionate to the value of the property transported.

"It has therefore become an established rule of the common law, as declared by this court in many cases, that such a carrier may by a fair, open, just, and reasonable agreement limit the amount recoverable by a shipper in case of loss or damage to an agreed value, made for the purpose of obtaining the lower of two or more rates of charges proportioned to the amount of the risk. *York Co. v. Railroad*, 3 Wall. 107 [18 L. Ed. 170]; *Railroad v. Lockwood*, 17 Wall. 357 [21 L. Ed. 627]; *Hart v. Pennsylvania Railroad*, cited above; *Phoenix Ins. Co. v. Erie Trans. Co.*, 117 U. S. 312, 322 [6 Sup. Ct. 1176, 29 L. Ed. 873]; *Steam Co. v. Phoenix Ins. Co.*, 129 U. S. 397, 442 [9 Sup. Ct. 469, 32 L. Ed. 788]; *New York, etc., Ry. Co. v. Estill*, 147 U. S. 591, 619 [13 Sup. Ct. 444, 37 L. Ed. 292]; *Primrose v. W. U. Telegraph Co.*, 154 U. S. 1, 15 [14 Sup. Ct. 1098, 38 L. Ed. 883]; *Chicago, etc., Ry. v. Solan*, 169 U. S. 133, 135 [18 Sup. Ct. 289, 42 L. Ed. 688]; *Calderon v. Steamship Co.*, 170 U. S. 272, 278 [18 Sup. Ct. 588, 42 L. Ed. 1033]; *Pennsylvania Railroad v. Hughes*, 191 U. S. 477, 485 [24 Sup. Ct. 132, 48 L. Ed. 268].

"That such a carrier might fix his charges somewhat in proportion to the value of the property is quite as reasonable and just as a rate measured by the character of the shipment. The principle is that the charge should bear some reasonable relation to the responsibility, and that the care to be exercised shall be in some degree measured by the bulk, weight, character, and value of the property carried.

"Neither is it conformable to plain principles of justice that a shipper may understate the value of his property for the purpose of reducing the rate, and then recover a large value in case of loss. Nor does a limitation based upon an agreed value for the purpose of adjusting the rate conflict with any sound principle of public policy. The reason for the legality of such agreements is well stated in *Hart v. Pennsylvania Railroad*, cited above, where it is said:

" 'The limitation as to value has no tendency to exempt from liability for negligence. It does not induce want of care. It exacts from the carrier the measure of care due to the value agreed on. The carrier is bound to respond in that value for negligence. The compensation for carriage is based on that value. The shipper is estopped from saying that the value is greater.

The articles have no greater value, for the purposes of the con-
tract of transportation, between the parties to that contract.
The carrier must respond for negligence up to that value. It is
just and reasonable that such a contract, fairly entered into,
and where there is no deceit practiced on the shipper, should be
upheld. There is no violation of public policy. On the contrary,
it would be unjust and unreasonable, and would be repugnant
to the soundest principles of fair dealing and of the freedom of
contracting, and thus in conflict with public policy, if a shipper
should be allowed to reap the benefit of the contract if there is
no loss, and to repudiate it in case of loss.'

"The statutory liability, aside from responsibility, for the
default of a connecting carrier in the route, is not beyond the lia-
bility imposed by the common law, as that body of law applicable
to carriers has been interpreted by this court as well as many
courts of the states. *Greenwald v. Barrett,* 199 N. Y. 170, 175
[92 N. E. 218, 35 L. R. A. (N. S.) 971]; *Bernard v. Adams
Express Co.,* 205 Mass. 254, 259 [91 N. E. 325, 327, 28 L. R.
A. (N. S.) 293, 18 Ann. Cas. 351]. The exemption forbidden
is, as stated in the case last cited, 'a statutory declaration that
a contract of exemption from liability for negligence is against
public policy and void.' This is no more than this court, as well
as other courts administering the same general common law, have
many times declared. In the same case, just such a stipulation
as that here involved was upheld; the court saying:

" 'But such a contract as we are considering in this case is
not an exemption from liability for negligence in the management
of property within the meaning of the statute. It is a contract as
to what the property is, in reference to its value. The purpose
of it is not to change the nature of the undertaking of the com-
mon carrier, or limit his obligation in the care and management of
that which is intrusted to him. It is to describe and define the
subject-matter of the contract, so far as the parties care to define
it, for the purpose of showing of what value that is which comes
into the carrier's possession, and for which he must account in
the performance of his duty as a carrier. It is not in any proper
sense a contract exempting him from liability for the loss, dam-
age, or injury to the property, as the shipper describes it in stating
its value for the purpose of determining for what the carrier
shall be accountable upon his undertaking, and what price the
shipper shall pay for the service, and for the risk of loss which the
carrier assumes.'

"In *Greenwald v. Barrett,* cited above, the same conclusion
was reached as to the nature of the liability imposed and the pur-

port of the exemption forbidden; the court, among other things, saying:

"'The language of the enactment does not disclose any intent to abrogate the right of common carriers to regulate their charges for carriage by the value of the goods, or to agree with the shipper upon a valuation of the property carried. It has been the uniform practice of transportation companies in this country to make their charges dependent upon the value of the property carried; and the propriety of this practice and the legality of contracts signed by the shipper, agreeing upon a valuation of the property, were distinctly upheld by the Supreme Court of the United States in *Hart v. Pennsylvania R. Co.,* 112 U. S. 331, 341 [5 Sup. Ct. 151, 156 (28 L. Ed. 717)]. * * *'

"That a carrier rate may be graduated by value, and that a stipulation limiting recovery to an agreed value made to adjust the rate is recognized by the Interstate Commerce Commission, see [*In re Released Rates*] 13 Interst. Com. R. 550.

"We therefore reach the conclusion that the provision of the act forbidding exemptions from liability imposed by the acts is not violated by the contract here in question."

In *Chicago, B. & Q. Ry. Co. v. Miller,* 226 U. S. 513, 33 Sup. Ct. 155, 57 L. Ed. ——, and *Chicago, St. P., M. & O. Ry. Co. v. Latta,* 226 U. S. 519, 33 Sup. Ct. 155, 57 L. Ed. ——, decided by the Supreme Court on the same date, the case of *Adams Express Co. v. Croninger,* 226 U. S. 491, 33 Sup. Ct. 148, 57 L. Ed. ——, is followed and the same rule announced.

It follows from the foregoing authorities that on account of the passage of the Hepburn Act by Congress on June 29, 1906 (34 St. at L. 584, c. 3591 [U. S. Comp. St. Supp. 1911, p. 1284]), the state under its police power has ceased to have authority to pass acts relative to contracts made by carriers relating to interstate commerce, and section 9, art. 23 (section 358, Williams' Ann. Const. Okla.), of the Constitution of this state, applies only to intrastate shipments.

This court, in many instances, has held that the common-law liability of the carrier for the safe carriage of property may be limited by a special contract with the shipper, where such contract is supported by a consideration, is reasonable and fairly entered into by the shipper, and does not attempt to cover losses caused by the negligence or misconduct of the carrier. *St. Louis & S.*

*F. R. Co. v. Copeland,* 23 Okla. 837, 102 Pac. 104; *Patterson v. M., K. & T. Ry. Co.,* 24 Okla. 747, 104 Pac. 31; *M., K. & T. Ry. Co. v. Davis,* 24 Okla. 677, 104 Pac. 34, 24 L. R. A. (N. S.) 866; *St. Louis & S. F. R. Co. v. Cake,* 25 Okla. 227, 105 Pac. 322; *Chicago, R. I. & P. Ry. Co. v. Wehrman,* 25 Okla. 147, 105 Pac. 328; *M., K. & T. Ry. Co. v. Hancock,* 26 Okla. 254, 109 Pac. 220; *M., K, & T. Ry. Co. v. Hancock & Goodbar,* 26 Okla. 265, 109 Pac. 223; *Midland Valley R. Co. v. Ezell,* 29 Okla. 40, 116 Pac. 163; *St. L. & S. F. R. Co. v. Young,* 30 Okla. 588, 120 Pac. 999; *C., R. I. & P. Ry. Co. et al. v. Spears,* 31 Okla. 469, 122 Pac. 228; *St. Louis & S. F. R. Co. v. Ladd,* 33 Okla. 160, 124 Pac. 461; *C., R. I. & P. Ry. Co. v. Conway,* 34 Okla. 356, 125 Pac. 1110. In all these cases the contract of shipment was entered into prior to the erection of the state. The decisions of the Supreme Court of the United States were controlling in the construction of said contracts, and were followed by this court in deciding said cases. As to the cases arising since the erection of the state, where the contracts relate to interstate shipment, the same authority governs. As to intrastate shipments a different rule applies.

Section 18, art. 9 (section 234, Williams' Ann. Const. Okla., par. 1), of the Constitution of this state, provides:

"All rates, charges, classifications, rules and regulations adopted, or acted upon, by any such company inconsistent with those prescribed by the commission, within the scope of its authority, shall be unlawful and void."

It is not contended that the commission has prescribed any such rules for the entering into of such contracts relative to intrastate shipments; and therefore contracts entered into between a shipper and a carrier in this state, relating to an intrastate shipment limiting the common-law liability of the carrier for the safe carriage of property, even though such contract be supported by a consideration, and fairly entered into between the shipper and the carrier, the same would be void; and any provision in any such contract between the shipper and the carrier relating to intrastate shipments, stipulating for the notice or demand as a condition precedent to establish any claim, demand, or liability of such shipper for breach of contract, is also void.

The court sustained the demurrer of the plaintiff to· certain parts of the second paragraph of the defendant's answer. No assignment ·or specification of error as to this action, relative to the demurrer, is made in the brief as required by rule 25 (20 Okla. xii, 95 Pac. viii) of this court, and the same is therefore waived.

The following specifications of error are presented for our consideration: (1) In ·overruling plaintiff in error's demurrer to the evidence. (2) In denying plaintiff in error's request for a peremptory instruction. (3) In admitting certain evidence on the part of defendant in error. (4) In excluding certain evidence offered by plaintiff in error. (5) In refusing to give the following instruction:

"If you find that the cattle arrived at the National Stock Yards, Ill., in a damaged condition, that alone will not warrant a recovery by the plaintiff. Before you can find for the plaintiff, you must be able to find, from ·a fair preponderance ·of the evidence, the further fact that the damaged condition was caused by and was the direct and proximate result of some act of negligence on the part of the defendant; and, unless you so find, you will find for the defendant."

The first and second specifications of error will be considered together.

1. In the brief of the plaintiff in error, it is said:

"This petition proceeds upon the theory that the defendant is liable in damages on account of failure to deliver the live stock, shipped by plaintiff, at destination within time for the market of a certain day. If in fact the shipping contract is to be considered of any binding efficacy, section 5 thereof is a sufficient answer to plaintiff's demand."

Section 5 of said contract is set out as paragraph 2 in the answer.

·If the failure to deliver within a reasonable time, so as to reach a particular market, is occasioned by the negligence or acts of omission on the part of the carrier, it is liable regardless of any contract to the contrary. The carrier is liable for delay occasioned by failure of engines, cars, machinery, obstructions of the track, or for any cause whatever, where such intervening cause results from the negligence or act of omission on the part

of the carrier. The evidence, as disclosed by the record, presented a question for the determination of the jury.

2. Under the third specification of error, the question as to the admission of the following evidence is presented for review:

"Q. State to the jury what condition those cattle were in. A. They were badly bruised, gaunted up, and gored, where they had hooked and horned one another, and made long scars and marks on them, and several showed where they had been badly handled in the cars. (Defendant objects to the evidence, or any evidence going to show that the damage is caused by the cattle goring one another. They cannot expect damages for the cattle goring one another. Objection sustained. Defendant reads live stock contract to the court. Objection sustained so far as the witness has testified about the cattle goring one another.) Q. State the condition of the cattle as to bruises, if there were any. A. They were badly bruised. Q. What caused this? (Defendant objects, as being incompetent and irrelevant. Objection overruled, to which ruling of the court the defendant excepts.) A. Being lugged about in the cars. Being jammed against the sides and ends of the cars."

This was not error under issues as framed in the trial court.

It is also insisted that the carrier is not liable for damages to the live stock shipped because of the inherent nature of the animals inflicting injury upon one another; that, if such liability may be incurred in any instance, by the terms of the contract the carrier in this case is not liable.

Section 4 of the contract, which is set out in paragraph "b" of the answer, does not relieve the carrier from the duty of furnishing proper cars; and if it furnishes defective cars on account of which the cattle are injured, or the injury is caused by such negligence, it cannot contract with the shipper so as to relieve itself from the consequence of such acts. As to overloading of cars, if the loading is done by the shipper, where such is permitted by law, then that is his negligence and not of the carrier. But if the cattle are placed in the stock pens, and the loading is done by the employees of the carrier, and by its negligence the cars are overloaded, it cannot relieve itslf from such negligence by contract. Likewise, if the live stock escape from cars as a

result of the negligence of the carrier, the same rule applies. If the live stock are injured on account of being wild, unruly, or weak, or maim each other or themselves, or from fright, crowding, heat, or suffocation, such injuries resulting therefrom being proximate to no act or omission of the carrier, then under said contract the carrier would not be liable. *St. Louis & S. F. R. Co. v. Copeland, supra.*

As to certain evidence on the part of the shipper relating to the value of the cattle, the witness stated that he knew the value of the cattle on the market, and then stated what the value was. He afterwards stated that he based this opinion upon statements made to him by a live stock purchaser at the stock yards, the point of destination; and the record shows that the witness was a cattleman with knowledge as to cattle.

In *St. Louis &. S. F. R. Co. v. Crowell,* 33 Okla. 773, 127 Pac. 1063, paragraph 1 of the syllabus is as follows:

"To lay a foundation for the admission of evidence as to the value of millinery goods kept for sale in stores, it is sufficient to show that the witness' knowledge was that of a dealer in such goods, and by pricing same at the time she made the purchase of the lot in controversy. The weight of the opinion then given is for the jury."

This was sufficient predicate for the admission of the evidence; the question as to its weight being for the jury.

3. As to the fourth assignment of error relative to the Live Stock Reporter, the record recites that it is made a part thereof, and identified as Exhibit B; but it appears not to have, in fact, been made a part of the record. The record recites:

"Q. I read from this paper the following sentence, and ask you to state— (Plaintiff objects to defendant reading from this paper, as it has not been proven to be an authoritative paper. Objection sustained as to so much of the reading as states the price sold for and the number of cattle.)"

No exception seems to have been reserved.

"Q. I will ask you to state whether, as a matter of fact, they were common ordinary Oklahoma Tale End steers. (Objected to as leading. Objection sustained, to which ruling of the court the defendant excepts.)"

The witness was introduced on the part of the defendant (plaintiff in error) ; and, the question clearly being leading, it was within the discretion of the trial court to sustain the objection on that ground. At another part of the record we find the following:

"Q. Mr. Bilby, I hand you the Daily Live Stock Reporter, which the reporter has marked defendant's Exhibit B, and call your attention to the date of April 10, 1909, and call your attention to the lefthand column on the front page, which has been marked with an indelible pencil, and ask you to state if that does not show the sale of your cattle? (To which the plaintiff objects because it is incompetent and immaterial. Objection sustained, to which the defendant excepts.)"

We fail to find in the record this exhibit or it identified in such a way as we can determine what the defendant was seeking to offer, and for that reason we are unable to determine whether the trial court committed error. The burden is on the plaintiff in error to show error. *Tate v. Stone, ante*, 130 Pac. 296.

4. As to the fifth specification of error, the instruction complained of seems to correctly define the law; but this subject appears to have been fully covered in the general charge, and, that being the case, the action of the trial court in that respect was free from error. *Coalgate Co. v. Hurst,* 25 Okla. 588, 107 Pac. 657; *Kingfisher Nat. Bank et al. v. Johnson,* 22 Okla. 228, 98 Pac. 343; *Citizens' Bank v. Garnett et al.,* 21 Okla. 200, 95 Pac. 755.

The judgment of the lower court is affirmed.

All the Justices concur.