### UNITED STATES v. OREGON SHORT LINE R. CO. et al.
### No. 9403.

Circuit Court of Appeals, Ninth Circuit.

June 27, 1940.

Norman M. Littell, Asst. Atty. Gen., Charles R. Denny, Jr., and Edward J. Hickey, Attys., Dept. of Justice, both of Washington, D. C., and John A. Carver, U.S. Atty., of Boise, Idaho, for appellant.

George H. Smith, of Salt Lake City, Utah, and H. B. Thompson and L. H. Anderson, both of Pocatello, Idaho, for appellees.

Before GARRECHT, HANEY, and HEALY, Circuit Judges.

HEALY, Circuit Judge.

In 1873 the United States granted to the Utah and Northern Railroad Company a right of way over the public lands for the construction of a railroad running northerly through Idaho into Montana. Act March 3, 1873, 17 St.L. 612. The company filed a series of maps of the definite location of its road, eleven of which were approved in 1882. Four other maps showing the line of the road through the Fort Hall Indian Reservation in the Territory of Idaho were disapproved for the reason that the grant did not entitle the company to build through the reservation. The latter had been set up by treaty made in 1868 with the Shoshone and Bannack tribes. Treaty of July 3, 1868, 15 St.L. 673.

Among the provisions of that treaty was one to the effect that, with certain exceptions not here pertinent, no persons "shall ever be permitted to pass over, settle upon, or reside in the territory described in this article for the use of said Indians, and henceforth they [the Indians] will and do hereby relinquish all title, claims, or rights in and to any portion of the territory of the United States, except such as is embraced within the limits aforesaid". Article 2.

Despite infirmities in its right of way, the company built its road through the reservation; and to remove the impasse a supplemental agreement was entered into in 1887 between the United States and the Indians for the grant of a right of way to the company. This treaty was ratified by the act of Congress of September 1, 1888. 25 St.L. 452.

The act contained sixteen sections, of which § 14, reading as follows, is here involved: "That said railway company shall execute a bond to the United States, to be filed with and approved by the Secretary of the Interior, in the penal sum of ten thousand dollars, for the use and benefit of the Shoshone and Bannack tribes of Indians, conditioned for the due payment of any and all damages which may accrue by reason of the killing or maiming of any Indian belonging to said tribes, or either of them, or of their livestock, in the construction or operation of said railway, or by reason of fires originating thereby; the damages in all cases, in the event of failure by the railway company to effect an amicable settlement with the parties in interest, to be recovered in any court of the Territory of Idaho having jurisdiction of the amount claimed, upon suit or action instituted by the proper United States attorney in the name of the United States: Provided, That all moneys so recovered by the United States attorney under the provisions of this section, shall be covered into the Treasury of the United States, to be placed to the credit of the particular Indian or Indians entitled to the same, and to be paid to him or them, or otherwise expended for his or their benefit, under the direction of the Secretary of the Interior."

Pursuant to this statute appellee Oregon Short Line Railroad Company (successor to the Utah and Northern) and its surety executed and delivered to the United States a bond in the penal sum of $10,000, reciting the grant of a right of way and the provisions of § 14, and providing that "if the said Oregon Short Line Railroad Company, its successors or assigns, shall make full satisfaction for any and all such deaths, injuries, or damages, then this obligation shall be null and void; otherwise to remain in full force and effect".

In 1939 appellant brought this suit on the bond on behalf of certain of the Indians. After setting up substantially the foregoing facts, the complaint alleged that on January 19, 1938, at a railroad crossing within the Fort Hall reservation, a train operated by the defendant railroad collided with an automobile occupied by four Indians of the Shoshone and Bannack tribes. Three of the Indians were killed, the fourth injured. It was alleged that the defendants failed, neglected and refused to make any settlement with the parties in interest. There was an averment that the funeral expenses incurred for the burial of the dead Indians amounted to approximately $2,500. The complaint closed with the allegation "that by reason of the matters and things herein alleged and set forth there is due, owing and unpaid from the defendants to the plaintiff for the use and benefit of the Shoshone and Bannack tribes of Indians and the parties in interest the sum of $10,000. That the Shoshone and Bannack tribes of Indians and the heirs, representatives and parties in interest of the deceased persons have been damaged in excess of $10,000."

There was no allegation of wrongful act or neglect on the part of the railroad company.

Answering, appellees interposed as a defense, among others, the failure of the complaint to state a claim upon which relief could be granted. This defense the court sustained, holding that the statute and bond provide for the recovery of damages for the violation of "an enforceable legal right", only. Appellant declined to plead further, and a judgment of dismissal was entered.

The parties agree, and we think rightly, that the bond does no more than effectuate the statutory purpose; hence the argument here concerns the interpretation of § 14 of the act. It is appellees' position, as it was the view of the trial court, that no new right is created—that the statute and bond merely provide security for the payment of legal damages which may accrue under existing law. Appellant, on the other hand, contends that they impose upon the railroad company liability independent of negligence.

We examine more particularly the wording of the statute. It requires the execution of a bond conditioned "for the due payment of any and all damages which may accrue by reason of the killing or maiming of any Indian belonging to said tribes * * * or of their livestock, in the construction or operation of said railway, or by reason of fires originating thereby." Provision is made for the recovery of the damages in any court of the Territory of Idaho having jurisdiction of the amount claimed. The statute does not in terms limit the liability for damages to those occasioned by the negligent operation of the railroad or by reason of fires negligently set. In their popular sense, the words used reasonably import the broad purpose of saving the Indians harmless, or of insuring them against loss even though occasioned by inevitable accident. Opposed to this interpretation is the narrow construction given the statute below and urged by appellees here.

It is important to note at the outset the general rule that statutes passed for the benefit of dependent Indian tribes or communities are liberally construed, doubtful expressions ordinarily being resolved in favor of the Indians. Alaska Pacific Fisheries v. United States, 248 U. S. 78, 39 S.Ct. 40, 41, 63 L.Ed. 138. The case just cited is authority for the familiar proposition that in arriving at the sense of the statute we ought to keep in mind the circumstances in which it was enacted, "the power of Congress in the premises, * * * the situation and needs of the Indians and the object to be attained."

By an earlier act, approved July 3, 1882, 22 St.L. 148, Congress ratified an agreement with the same tribes for the relinquishment to the United States of a portion of the Fort Hall reservation required for the use of the same railroad company in the construction of a line running through the reservation in an easterly and westerly direction, forming a junction at Pocatello with its line running north and south. By the act the United States in turn granted to the company a right of way over the lands relinquished.[1] As a condition to the continued use of the lands, section 3 imposed liability for the payment of damages in terms similar to those of the statute under inquiry. The pertinent portion of the section is copied on the margin.[2]

These acts evidence a policy of exacting from the railroad company indemnification for "any and all damages" to life or property of the Indians growing out of the operation of the railroad within the

---

[1] The railroad company was required to pay, for the benefit of the Indians, the sum of $7.77 per acre for the land ceded. Likewise, in the act of September 1, 1888, it was required to pay for the land in the right of way at the rate of $8 per acre.

[2] "Nor shall said land, or any part thereof, be continued to be used for railroad purposes by or for said Utah and Northern Railroad Company, its successors or assigns, except upon the further condition that said company its successors or assigns, will pay any and all damages which the United States or said Indians, individually or in their tribal capacity, or any other Indians lawfully occupying said reservation, may sustain by reason or on account of the act or acts of said company, its successor or assigns, its agents or employees, or on account of fires originating by or in the construction or operation of such railroad, the damages in all cases to be recovered in any court of the Territory of Idaho having jurisdiction of the amount claimed, upon suit or action instituted by the proper United States attorney in the name of the United States * * *."

reservation. The acceptance of the burden, whatever its extent, was an express or implied condition of the grant of the right of way in each instance.

Prior to 1888 legislation had been enacted in many states, imposing on railroad companies the liability of an insurer on account of damages to property by fire communicated directly or indirectly by their locomotives. The constitutionality of such legislation was generally upheld on the theory that the locomotive is a dangerous agency, and that one who profits from its use may lawfully be required to assume full responsibility for loss caused by it. An extensive review of the history and philosophy of preceding legislation of this type is contained in St. Louis & San Francisco Ry. Co. v. Mathews, 1897, 165 U.S. 1, 17 S.Ct. 243, 41 L. Ed. 611.

Chief Justice Shaw, in Hart v. Railroad Corporation, 1847, 13 Metc., Mass., 99, 46 Am.Dec. 719, speaking of a statute of this character, had said: "Railroad companies acquire large profits by their business. But their business is of such a nature as necessarily to expose the property of others to danger; and yet, on account of the great·accommodation and advantage to the public, companies are authorized by law to maintain them, dangerous though they are; and so they cannot be regarded as a nuisance. The manifest intent and design of this statute, we think, and its legal effect, are, upon the considerations stated, to afford some indemnity against this risk to those who are exposed to it, and to throw the responsibility upon those who are thus authorized to use a somewhat dangerous apparatus, and to realize a profit from it."

And the policy prompting the imposition of absolute liability was summarized in Martin v. New York & New England R. R. Co., 1892, 62 Conn. 331, 25 A. 239, 240, as follows: "The reasons underlying this legislation are not hard to find. The railroad companies were in possession of great powers and privileges granted by the state. The use of such powers was necessarily attended with dangers to property along the line of the road, and fires were of frequent occurrence. The legislature rightly judged that it was hard for individuals to bear all these losses, and that the railroad companies might well be required to make them good. Nor is such a requirement unjust. On the contrary, it is substantially right and just. Railroad companies possess extensive powers and valuable franchises, by means of which they are able to collect large sums of money from the public. In using such powers and franchises, they necessarily expose private property. They have a license from the public to carry on extensively a dangerous business, from which they receive large profits. Why should not they be required to assume the risk, rather than individuals?"

Doubtless inspired by reasons of like kind, a number of the states had enacted legislation imposing upon railroads absolute liability for the killing of livestock. These statutes fared less well in the courts, a number of them being ultimately declared unconstitutional.[3] Idaho had one, Castril v. U. P. R. R. Co., 2 Idaho, Hasb., 576, 21 P. 416, but so far as we are advised there was no legislation in the territory imposing like liability for fires. In Nebraska there was a statute making railroads liable as insurers for injuries to or the death of passengers. See Chicago R. I. & Pac. Railroad Co. v. Zernecke, 1902, 183 U.S. 582, 22 S.Ct. 229, 46 L.Ed. 339. From these legislative examples it would appear that the statute under consideration, assuming that it placed upon the railroad company unconditional responsibility for damages to the Indians and their property, was not without substantial precedent even in circumstances less compelling.

In a report submitted June 5, 1888, with the bill for the act here being considered, the House Committee on Indian Affairs said: "This bill was drawn in the Interior Department and is intended fully to cover and protect the interest of the Indians concerned. * * * Provision is made for indemnification by the railway company to the Indians for killing or maiming the Indians or their stock; also for fencing in the railway track where it runs through the improved lands of the Indians. We believe, in, short, that every interest of the Indians has been jealously guarded and protected."

From a consideration of the statute in

---

[3] For cases dealing with statutes of both types, see annotation in 53 A.L.R. 875 et seq. Consult also Missouri Pac. Ry. Co. v. Humes, 1885, 115 U.S. 512, 6 S.Ct. 110, 29 L.Ed. 463.

its setting it is difficult to conclude otherwise than that Congress intended thereby to surround the Indians with a measure of protection consistent with the increased hazards to which the advent of the railroad subjected them. The right of the Indians, or of the United States as their guardian, to resort to the territorial courts as a forum for the redress of injuries caused by wrongful act or neglect needed no Congressional sanction, nor did the substantive right to recover for such wrongs need to be declared. It is significant, too, that the damages were made recoverable, not in any territorial court "having jurisdiction of the cause of action", but in any such court "having jurisdiction of the amount claimed".

The injuries for which indemnity is provided are of a character ordinarily inflicted only by railroad locomotives or moving trains. Of possible injuries of a nature not peculiar to such operations Congress took no note. But it recognized that, in the daily and nightly operation of trains through the area in which the Indians were by the treaty required to live, these primitive people were perforce exposed to hazards at once unfamiliar and formidable.

The jealous safeguarding of the Indians from casualties to their livestock on the open range and from destruction of their property and grass lands through the spread of fire could hardly be thought to lie in the mere exaction of security for the payment of "legal" damages, recoverable only on proof of negligence. There is nothing in the committee report indicating uneasiness in Congress concerning the solvency of the railroad. In this connection it should be noted that the earlier statute of 1882 required no bond. Clearly in respect of responsibility for damages to property, we would be ignoring the realities of the situation confronting the Indians if we failed to recognize that Congress had the sterner purpose, fairly expressed, of placing on the railroad rather than on the aborigine the full burden° of such losses. And as between damages to the property of the Indians and damages to their persons the act makes no distinction. The protection afforded is as broad in the latter respect as in the first.

Appellees urge that the words "damages which may accrue" import a liability not different from or greater than that imposed by law, as administered by the courts of the United States or of the territory. In effect, they contend that the words are words of art, hence were used in a technical sense. However, the words must be read with the context. So read they aptly express the broader purpose of imposing liability independent of the railroad's negligence.

■ Appellees argue here, as they did below, that such interpretation of the statute would serve to render it unconstitutional. They do not, however, indicate what constitutional right would be impaired by the interpretation. We know of no reason, and none has been suggested, why Congress may not, as a condition of its grant of a right of way through an Indian reservation, impose upon a railroad company the full burden of losses to the tribal Indians and their property occasioned by the operation of trains within the borders of the reservation. Cases dealing with general statutes have no application.

Reversed.

HANEY, Circuit Judge (concurring).

While I concur in the result, I think it wholly unnecessary to construe the statute in question, and believe that the case should be decided upon the following theory:

As stated by the majority, this action was brought to recover "on the bond". Therefore liability is measured by the bond. Appellees were required to pay "damages which may accrue" under the terms of the bond, and the dispute arises over the meaning of the word "damages" and the word "accrue".

The word "damages" has at least two meanings. It might mean "loss due to injury" in the broad sense (see Webster's New Int.Dict., 2nd Ed.); or it might have the narrow meaning, contended for by appellees, shown by 1 Bouv.Law Dict., Rawle's 3d Revision, p. 749, as follows: "The indemnity recoverable by a person who has sustained an injury, either in his person, property, or relative rights, through the act or default of another". Compare: Boston Sand Co. v. United States, 278 U.S. 41, 49 S.Ct. 52, 73 L. Ed. 170.

While it is often said that a surety contract is to be strictly construed, such statement means only that the obligation is not to be extended to any other subject, to any other person, or to any other peri-

od of time than is expressed or necessarily included in it, and such contract is subject to the same rules of construction and interpretation as every other contract. Warner v. Connecticut Mut. Life Ins. Co., 109 U.S. 357, 363, 3 S.Ct. 221, 27 L.Ed. 962. One rule of construction is stated in Calderon v. Atlas Steamship Company, 170 U.S. 272, 280, 18 S.Ct. 588, 591, 42 L.Ed. 1033, as follows: "* * * In construing contracts, words are to receive their plain and literal meaning, even though the intention of the party drawing the contract may have been different from that expressed. * * *" Applying that rule here, it is necessary to hold that the broad meaning of "damages" was intended.

Much argument is made concerning the meaning of the word "accrue", but as used in the bond nothing indicates a special meaning. We may treat it as if it meant "arise". Compare: H. Liebes & Co. v. Commissioner of Internal Revenue, 9 Cir., 90 F.2d 932, 936.

Under the terms of the bond, I believe appellant was not required to prove that the damages resulted from the railroad's negligence. Whether the bond is broader in its scope than the statute which provides for it, what the meaning of the statute is, and whether such statute is constitutional, are questions which need not and should not be passed upon. No question as to the amount of appellees' liability is raised, and I express no opinion on such question.