**Rose Mary MARSH, Administratrix of the Estate of Atana Wesley, Deceased, Plaintiff,**

v.

**UNION PACIFIC RAILROAD COMPANY, a corporation, Defendant.**

**Mary STOVER, Administratrix of the Estate of Katherine Stover, Deceased, Plaintiff,**

v.

**UNION PACIFIC RAILROAD COMPANY, a corporation, Defendant.**

**Civ. Nos. 68–463, 465.**

United States District Court
D. Oregon.
July 8, 1969.

Raley F. Peterson, Peterson & Peterson, Pendleton, Or., and Roy Kilpatrick, John Day, Or., for plaintiffs.

Austin W. Crowe, Jr., Maguire, Kester & Cosgrave, Portland, Or., for defendant.

OPINION

KILKENNY, District Judge:

These cases were consolidated for trial on the segregated issue concerning the applicability of the doctrine of absolute liability on the facts presented.

Plaintiffs, in their capacity as administratrices, seek damages for the alleged wrongful death of their intestates. De-

cedents were killed when one of defendant's locomotives collided with an automobile, in which decedents were guests, on a railroad crossing in the Umatilla Indian Reservation, in Umatilla County, Oregon. The accident occurred on November 2, 1967.

The segregated issue currently before me is whether the defendant is subject to the rule of absolute liability by reason of the fact that the alleged wrongful deaths occurred on the Umatilla Indian Reservation, the plaintiffs claiming that the Agreement between the Oregon Railway & Navigation Company, its successors and assigns, and the Walla Walla, Cayuse and Umatilla Tribes residing on the Reservation, dated June 10, 1881, and the execution of a certain bond, of the same date, for the protection and benefit of the Confederated Umatilla Indian Tribes, creates such liability. The decedents were enrolled members of said Tribes and residents on the Reservation.

A chronology of events is helpful. On June 9, 1855, 12 Stat. 945, the United States and the Walla Walla, Cayuse and Umatilla Tribes concluded a Treaty at Camp Stevens in the Walla Walla Valley, Washington, territory. The agreement was ratified by the United States Senate on March 8, 1859, and proclaimed by the President on April 11th of the same year. The Treaty made provision for the acquisition of rights-of-way through the Reservation.[1] Plaintiffs, as a basis for recovery on the theory of absolute liability, emphasize certain language used by General Palmer, Governor of the Oregon Territory, in the negotiations leading up to the Treaty.[2] Also in the negotiations, but not emphasized by plaintiffs, is other language of General Palmer which precedes the language emphasized by the plaintiffs and which, I believe, is of significance.[3]

The next event of importance is the Proclamation by President Rutherford B. Hayes granting Oregon Railway & Navigation Company, predecessor of defendant, the authority to enter into an agreement with the Confederated Tribes of the Umatilla Indian Reservation and to compensate the Indians for a right-of-

1. Right of way reserved for roads through reservation.

    *Article X.* The said confederated bands agree that, whenever in the opinion of the President of the United States the public interest may require it, *that* all roads highways and *railroads* shall have the right of way through the reservation herein designated or which may at any time hereafter be set apart as a reservation for said Indians. (Emphasis supplied.)

2. "Now as we give you the privilege of traveling over roads, we want the privilege of making and traveling roads through your country, *but whatever roads we make through your country will not be for your injury.*" (Emphasis supplied.)

3. "My Brother has stated that you will be permitted to travel the roads outside the Reservation. We have some kind of roads which perhaps you have never seen; we may wish to make one of the roads from the settlements east of the mountains *to our settlements here*; they may desire to run that road through your Reservation; if we desire to do so we wish that privilege; that kind of road we call a railroad. I will try and explain to you the way in which we make such roads. We first lay on the ground sticks of timber, we then lay other sticks across that way, unite them together and put a strip of iron on the top of them, we then place a wagon on those tracks and instead of having horses or oxen hitched to the wagon we build a fire; some of you have seen a steam boat; they have on this wagon a boiler filled with water, the fire heats the water and produces steam, which propels the machine. I am unable *to explain all the machinery or the way* in which it works but they will travel faster than your swiftest horses can run, all the time. If we start from here at sunrise we can be at Wascopen by the middle of the day. We sometimes attach twenty of those wagons together and one of those Engines draws the whole, they will take wagons enough to draw more people than are here. We call the wagon in which they have the fire and water a Locomotive, I have rode on those wagons many a time so have our people here all or nearly all of them. Now if our chief desires *to construct* such a road *through* your country we want you to agree that he shall have the privilege. You would have the benefit of it as well as other people."

way for a railroad. This Proclamation was in strict conformity with the provisions of Article X of the Treaty of 1855.

Following the Proclamation, the Walla Walla, Cayuse and Umatilla Tribes negotiated with the Oregon Railway & Navigation Company, as a consequence of which, on June 10, 1881, an agreement with reference to a right-of-way across the Reservation was signed. This agreement provided, among other things, that defendant's predecessor would pay to the Indians certain sums per acre not only for the land taken and used in the right-of-way, but also for several plats of land for the right of occupancy for depot purposes. Additionally, defendant's predecessor agreed to pay to and reimburse the several Indians, whose names appeared on the schedule,[4] a just and fair compensation in money for all individual improvements that might be taken, destroyed or otherwise injured in the construction of the railway and in the event of their failure to agree that the matter would be determined by the Secretary of the Interior. A provision is made to pay all damages that might be sustained by the Indians, collectively or individually, on account of fires started or stock injured or killed by locomotives during the construction or operation of the railroad through the Reservation. No provision is made for injuries to, or death of, Indians. The Agreement was approved by the Tribes and by the Secretary of the United States Department of the Interior on August 26, 1881.

Next, in point of time, was the posting on June 10, 1881, of a bond under the terms of which the railroad company and two sureties were held and firmly bound unto the United States in the penal sum of $30,000.00 in trust on the order of the Secretary for the various Tribes of the Walla Walla, Cayuse and Umatilla Indians residing on the Umatilla Indian Reservation.

The Treaty of 1855 also provided for the issuance of Patents to individual Indians. The railroad was constructed pursuant to the agreement and completed in the year 1884. On September 16, 1899, the United States issued to We-La-Lot-Sa-Mi[5] a Patent for the particular land on which the crossing in question is located. The Patent provided that the land should be held in trust for the Patentee for a period of 25 years, being issued pursuant to 23 Stat. 340. Under the terms of the Patent, the patentee would have received a fee simple title in 1924. However, in 1911, the City of Pendleton, for the use and benefit of its Water Commission, condemned this land in an action prosecuted in the Circuit Court of the State of Oregon.

■ Although plaintiffs argued to the contrary, I take judicial notice of the fact that Isaac I. Stevens, one of the negotiators of the Treaty of 1855, was appointed by President Pierce and acted for the United States, rather than the railroad, while negotiating with others the Treaty here in question.

■ Plaintiffs lean heavily on the following language of the bond.

"* * * or if losses or damage occasioned by fire from the locomotive or other agency of the said Oregon Railway and Navigation Company, the full value of *such loss or damage or of any other loss or damage sustained* by said tribes or band of Indians *or the individuals thereof* in consequence of the running of trains or the operating of the railway of said Company." (Emphasis supplied.)

The bond, the agreement of June 10, 1881, and its modification, must be construed together. Substantially contemporaneous instruments are to be read together in determining, as between the parties to, or their successors in interest, the nature of the transaction. Oregon-Pacific Forest Products Corp. v. Welsh Panel Co., 248 F.Supp. 903 (D.Or. 1965); Phoenix Title & Trust Co. v. Stewart, 337 F.2d 978 (9th Cir. 1964),

4. There is no claim that decedents were named, nor were their ancestors.

5. Literal translation—"Rattling while going".

cert. denied 380 U.S. 979, 85 S.Ct. 1335, 14 L.Ed.2d 273 (1965); Hays v. Hug, 243 Or. 175, 412 P.2d 373 (1966); Lowe v. Harmon, 167 Or. 128, 115 P.2d 297 (1941); Hattrem-Nelson & Co. v. Salmon River-Grande Ronde Highway Improvement Dist., 132 Or. 297, 285 P. 231 (1930).

█ It is plaintiffs' position that the language of the bond is strikingly similar to the language of the statute under scrutiny in United States v. Oregon Short Line R. Co., 113 F.2d 212 (9th Cir. 1940). In *Oregon Short Line*, its predecessor constructed a railroad line across the Fort Hall Indian Reservation under an agreement made pursuant to Section 14 of 25 Stat. 452. This law required the railway company to execute a bond to the United States conditioned for the due payment of any and all damages which might accrue for the use and benefit of the Bannack Tribes of Indians, *by reason of killing or maiming of any Indian* belonging to the Tribes, or either of them. Quite frankly, I find no similarity of any consequence between the language of the bond before me and the language of the Statute in the *Oregon Short Line* case. In the latter, the Statute specifically provided for compensation in connection with the killing or maiming of individual Indians. Here, we have no such requirement. I believe it only fair to invoke the rule of *ejusdem generis*. Generally, where no intention to the contrary appears, general words used after specific terms are to be confined to the things previously specified. Rayburn v. Crawford, 187 Or. 386, 211 P.2d 483 (1949); United States Fidelity & Guaranty Co. v. Thomlinson-Arkwright Co., 172 Or. 307, 141 P.2d 817 (1943); McGrath v. Electrical Constr. Co., 230 Or. 295, 364 P.2d 604, (1961), rehearing denied 230 Or. 295, 370 P.2d 231 (1962). Consequently, the scope of the general words on which the plaintiffs rely should be confined to the specific items of damage mentioned in the bond and in the 1881 Agreement and Modification.

Even placing the broadest possible construction on the *Oregon Short Line* case, it does not support plaintiffs' theory of absolute liability under the Treaty, the Agreements and Bond here before me.

It is my considered judgment that the doctrine of absolute liability cannot be invoked on the record here presented. I do not reach the jurisdictional issues raised by plaintiffs. I have, however, jurisdiction to pass on the issue of absolute, or contractual, liability here segregated for trial.

Counsel for the respective parties are directed to meet in pre-trial conference in September, 1969, or sooner, if directed.